

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-11-00112-CR
_____

JESSECA BAIN CARSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 4th Judicial District Court
Rusk County, Texas
Trial Court No. CR09-067

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

O P I N I O N

## I.    Introduction

Jesseca Bain Carson was convicted of capital murder, as a party to the murder, of her thirteen-month-old child by her boyfriend while he, over a period of thirty hours of physical torture, attempted to exorcise the demon he claimed resided within the child.  Carson was sentenced to life without possibility of parole.

Carson's appeal asserts that:

- the evidence is insufficient to show that she participated with her boyfriend in the murder;
- there is a fatal variance between *allegata* "unknown to the grand jury" and the proof at trial of cause of death;
- the evidence was insufficient to show the child, Amora, was strangled as alleged in the indictment;
- the court erred by failing to submit a requested jury instruction on "mistake of fact";
- the court erred by failing to submit requested lesser-included offense instructions on:
  criminally negligent homicide; and
  reckless injury to a child; and
- the imposed sentence, life without possibility of parole, violates the United States and Texas Constitutions as cruel and unusual punishment—violative of the Due Process and Equal Protection Clauses.

## II.    Sufficiency of the Evidence

### A.    Standard of Review

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of capital murder beyond a reasonable doubt.  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979));

2

*Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. In this case, Carson committed capital murder if she intentionally or knowingly murdered an individual under six years of age or was criminally responsible as a party to the offense.[1] The jury was so charged.

Carson's arguments regarding the sufficiency of the evidence are threefold: (1) she contends that the evidence is insufficient to support her conviction as a party to the offense; (2) she claims that the evidence of the instrument of death is insufficient to support her conviction because it varies from the allegations of the indictment ("unknown to the grand jury")

---

[1] Act of May 19, 2005, 79th Leg., R.S., ch. 428, § 1, 2005 Tex. Gen. Laws 1129 (amended 2011) (current version at TEX. PENAL CODE ANN. § 19.03(a)(8) (West Supp. 2012)).

on that issue; and (3) she argues that the evidence is insufficient to support a finding that the victim, her child, was strangled.

### B. Overview of Facts

Over a period of thirty hours, Carson's live-in boyfriend, Blaine Keith Milam, murdered Carson's daughter while purportedly exorcising the demon that he believed possessed her. Milam was convicted of capital murder in a separate trial and sentenced to death.[2] Carson was present at all times inside the manufactured home during the time the murder occurred. Carson gave a recorded statement to Ranger Kenny Ray which was played to the jury. She also testified at her trial.

Carson was seventeen when she met Milam in 2008. He proposed to her on prom night. During this time, Milam appeared to love Amora, Carson's child. Carson left her mother and brother and moved in with Milam. During that summer, Carson's family began to see her less often until, in October, she no longer had any contact with her mother and began to say that her mother killed her father. Carson became very withdrawn and unconcerned about her appearance. From outward appearances, Milam was making the decisions for them. Some evidence was presented that before Carson met Milam, she was neatly dressed and cared properly for her baby. Later in their relationship, Milam became a jealous and controlling person. Carson never left

---

[2]Milam's direct appeal to the Texas Court of Criminal Appeals was decided on May 23, 2012, and the conviction was affirmed. *Milam v. State*, No. AP-76,379, 2012 Tex. Crim. App. Unpub. LEXIS 547 (Tex. Crim. App. May 23, 2012) (not designated for publication).

their apartment except with Milam, friends no longer were seen coming over, and Carson was with Milam at all times, even during his work hours.[3]

Carson testified that Milam was very jealous of her. He began using her passwords to gain access to the Internet and pretended he was her while communicating on the Internet. Carson and Milam began using an Ouija board after Milam's father died. They began to "talk" to their deceased fathers by using the board. The Ouija board told Carson that her mother killed her father and the only way to get any peace was for her to do something about it. Carson believed their apartment was possessed by evil spirits, so they moved in with Milam's mother. Carson later became convinced that Milam was possessed by an evil spirit based on his expressions, tone of voice, and "something that wasn't what I knew Blaine to be." Milam explained that after the demon came into him, he could "talk to God," and he said Carson was causing this by lying to him. But during all this time when Milam was demon possessed, he was absolutely fine with Amora. According to Carson, Milam loved Amora and was "wonderful with her."

By December 1, 2008, Carson testified that she no longer would question Milam because he told her "God says there's things that you don't need to know right now . . . ." On December 1, 2008, Milam woke Carson and reported that Amora was possessed by a demon and was walking (she was too young to walk). Milam said that this occurred because Carson had not been honest with him and that God was tired of her lying to Milam. Carson asked Milam if there was something they could do and Milam said God would show him how to do an exorcism.

---

[3]If Carson ever threatened to leave Milam, he would take the spark plugs out of the car.

5

Carson did not understand what an exorcism was or how it was done. Milam told her that since God was showing him how to do the exorcism, it would help "Amora." She and Milam were staying in the master bedroom, but Milam had Amora in the back bedroom to conduct the exorcism.

As a result of the "exorcism" conducted by Milam, Amora suffered innumerable injuries that led to her death. Forensic evidence showed the child was beaten so severely that the multitude of fractures to her skull connected with each other like a jigsaw puzzle, and her brain was torn and severely damaged. An arm and leg had spiral fractures indicating they were twisted in two, her torso was either struck by a blunt object or squeezed until the ribs and sternum broke, and her body (neck, chest, abdomen, buttocks, both elbows, both forearms, both feet, right arm, left shoulder, left upper arm, left hand, right thigh, and left knee) was riddled with no less than twenty-four distinct bite marks. Her head and face were so scraped and bruised that all the discrete injuries combined into "one giant injury." Her liver was torn, and her vaginal and anal orifices were so torn that the vagina and rectum were actually connected, an injury the forensic examiner had never seen before. The underside of her tongue was lacerated from blunt force trauma. She was also strangled. Because of all the injuries she sustained, it was not possible to determine which one was the final injury, and no specific, singular cause of death was determinable. Forensic testimony reflected that several of the injuries standing alone would have each been fatal. Police were called several hours later; when they arrived, the child was entirely stiff and in rigor.

Carson concluded that the child was like "Chucky" or "Pet Sematary" (horror movies) when the "boy dies and comes back to life all evil and stuff" because the child was "biting Blaine to where it was drawing blood on his hands." After Milam returned to the child, he took a picture of her and gave it to Carson. One of the child's eyes was stretched and "like warped down." Carson heard horrible cries from the child as Milam was attempting the exorcism. Once, he left the door open, and Milam told Carson the child ran out. Carson went into the back bedroom, and Milam told her that the child was under the bed. Milam ordered Carson to leave the bedroom. According to Carson, when she saw Amora, the child was not harmed. Milam told Carson that God told him the child got the hammer and was hitting herself on the head. Carson, acknowledging that she saw her child during this time, stated, "I saw her, but the first couple of times, he didn't -- I didn't want to see her." She thought it was not really her child, but the "demon possessing her or whatever." They placed the child in a car seat and drove to Wal-Mart. Milam got out and went into Wal-Mart and Carson waited until he returned and drove back home.

Carson and Milam agreed that he was tempted to sell his soul to the devil and thereby gain the child's release from the demonic possession. Milam finally said that might be required of him, but Carson urged him not to be trapped by the devil that way. Milam agreed and went back into the bedroom with the baby to resume the exorcism. When asked if Milam told her how God had told him to actually do the final exorcism that sent the child to heaven, Carson answered that he did not tell her, but that she did not ask. "I just let him go in there, and I heard the demon cry out and scream out . . . . I heard a lot of banging." At one point, Milam told Carson he used a

7

rope to tie up the child to still the demon. Carson told Milam she would rather the child "go to heaven now than spend a life with Satan having her soul." The child was left in a hole in the bathroom floor. When the police came to investigate, Carson told the investigator that she and Milam had been out on their property discussing where to put their new manufactured home. According to her original story given to Ranger Kenny Ray, Carson and Milam woke up the morning of the child's death and, while the baby was sleeping, walked over to property where they intended to put a manufactured home. After being gone for about two hours, when they returned inside, the child was not in her playpen. They found the child in a hole in the bathroom floor and attempted resuscitation efforts. She asked, "What kind of monster did this?" Later, Carson admitted that she fabricated this story because "they wouldn't believe us." She was afraid they would be sent to a mental institution or be arrested for murder.[4]

Scientific evidence reveals that the child's blood was found in various parts of the manufactured home.

During the hours involved, Milam had taken the child to a back bedroom in their small dwelling and wedged the door shut. The evidence would allow a jury to conclude that Carson was necessarily aware of what was happening to the child, because she admitted hearing the screams that accompanied such torture and because she saw the child's deformed head after some time had passed and heard the sounds caused by the blows.

There is evidence that Carson not only allowed Milam to take her infant child into the other room, but that since the child was possessed by a demon, as Milam proclaimed, she

---

[4]Milam was a registered sexual offender and Carson was in court the day Milam pled guilty to the sexual offense and heard the discussion of sexual-offender registration.

8

actually encouraged him to do whatever was necessary to rid her of the demon. The evidence shows that Carson was in the trailer the entire time and that there was blood spatter on the door that she would necessarily have seen. She admitted going into the bedroom, but claims she was then told by Milam that the demonic child was hiding under the bed before he sent Carson to the other bedroom.

Carson admitted encouraging Milam to do what was necessary to save her baby's soul and reminding him that Amora was possessed by a demon so he would not feel bad about hurting her. She also admitted seeing the marks made when Milam bit Amora—purportedly to stop the child's attacks against him with a kitchen knife. Carson testified that she talked to the child at various points during the exorcism. She stated that she would

> try to let her hear my voice. And it would be her for a little while, and then it would start getting mean again. And then I was like, "Is it coming back?"
> And he said "Yeah, it's coming back," and so I would just leave again, and then he would leave, too.

It is clear that Carson agreed to the final round of the exorcism and that she saw the child before it began—and sat and watched television until Milam was finished.

### C.    Criminal Responsibility

Carson argues that the evidence is insufficient to prove that she is criminally responsible for the murder of the child.

"Criminal responsibility" is defined as follows:

> (a)    A person is criminally responsible for an offense committed by the conduct of another if:
>
> . . . .

9

(2)     acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or

(3)     having a legal duty to prevent the commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

TEX. PENAL CODE ANN. § 7.02(a) (2)–(3) (West 2011).

### 1.     TEX. PENAL CODE ANN. § 7.02(a) (2)
### Traditional Criminal Responsibility as a Party

The traditional party responsibility is set out in Section 7.02(a) (2) of the Texas Penal Code. It is true, as argued by Carson, that mere presence alone is not sufficient to support a conviction as a party. When a party is not the "primary actor," the State must prove conduct constituting an offense, plus an act by the defendant done with the intent to promote or assist such conduct. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985). But if the evidence shows the defendant was physically present at the commission of the offense and encouraged its commission by words or other agreement, the evidence is sufficient. *Tarpley v. State*, 565 S.W.2d 525, 529 (Tex. Crim. App. [Panel Op.] 1978); *Hoang v. State*, 263 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Proof of such an agreement often is by the actions of the parties, shown by direct or circumstantial evidence to establish a common design to commit the offense. *Tarpley*, 565 S.W.2d at 529. But in this case, Carson owed her child a legal duty of protection, which activates another statutory manner of invoking criminal responsibility for the conduct of another.

10

## 2.    TEX. PENAL CODE ANN. § 7.02(a) (3)
### Legal Duty Imposing Criminal Responsibility

A person commits capital murder if he or she intentionally or knowingly causes the death of an individual under ten years of age. TEX. PENAL CODE ANN. § 19.02(b) (1) (West 2011), § 19.03(a) (8) (West Supp. 2012). A person acts knowingly or with knowledge with respect to a result of his or her conduct when that person is aware that his or her conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b) (West 2011).

Traditionally, proof of party responsibility is governed by Section 7.02(a) (2) of the Texas Penal Code, which requires proof that the party acted with intent to promote or assist the commission of the offense and that he or she solicited, encouraged, directed, aided, or attempted to aid the other person to commit the offense. In this case, the jury was additionally charged that Carson could be criminally responsible for the offense if she, "acting with intent to promote or assist" the commission of the offense, failed to make a reasonable effort to prevent the commission of the offense. TEX. PENAL CODE ANN. § 7.02(a) (3).

The difference in the Section 7.02(a) (3) standard and the traditional party definition in Section 7.02(a) (2) is that "fails to make a reasonable effort to prevent commission" substitutes for the "solicits, encourages, directs, aids, or attempts to aid" language. TEX. PENAL CODE ANN. § 7.02(a) (2)–(3). So, where a person has a legal duty to prevent commission of the offense, but fails to make a reasonable effort to do so, responsibility as a party attaches if the evidence shows that the person acted with intent to promote or assist in the commission of the offense; however, it is not necessary to prove that he or she solicited, encouraged, directed, or aided in the

11

commission of the offense. *Raspberry v. State*, 757 S.W.2d 885, 887 (Tex. App.—Beaumont 1988, pet. ref'd) ("Section 7.02(a) (3) is concerned with situations in which a person may be criminally responsible for the conduct of another by failing to act.").

Here, Carson, as the mother of the victimized child, had a statutory duty to care for and protect the child, which certainly would include preventing the child's assault and ultimate murder. The Texas Family Code provides:

> (a)  A parent of a child has the following rights and duties:
>
> . . . .
>
> (2)  the duty of care, control, protection, and reasonable discipline of the child[.]

TEX. FAM. CODE ANN. § 151.001 (West 2008).

Some evidence shows that Carson requested or at the very least encouraged Milam to perform the exorcism. During the thirty-hour period of horrendous torment of the child, Carson was present, and at one time, she saw a photograph of Amora showing abuse to the child's face and eye. The door was open at times. Even though Carson heard terrible cries from the child, she did nothing to aid her. The blood traces revealed that the child had been in several rooms in the manufactured home. Carson agreed that the child was possessed by the devil and encouraged Milam not to fall prey to the tricks of the devil.

Carson told an investigator:

[T]he demon was trying to come after him and try to kill him or whatever, so he pushed the demon away that was in Amora's body, and he started crying afterwards. He said he felt bad for it, because it was like he was pushing Amora. I said, "Blaine," I was like, "That is not Amora. That is somebody -- that is just

12

her body, and that's some demon in there possessing her." I was like, "You did not push Amora. You pushed the demon."

At some point, Carson and Milam drove to Wal-Mart and Carson was alone with the child, but Carson did not examine or help the child. Instead, she waited for Milam to return.

The evidence allows the inference that Carson knew what Milam was doing to the child. She saw a photograph taken by Milam of the child's distorted head, heard her cries, and saw some of the twenty-four separable bite marks. Carson knew that Milam had used a rope in his actions toward the child. The evidence shows that not only did Carson not attempt to stop Milam, she encouraged him to continue despite obvious physical injuries to her child. Finally, no immediate call for emergency assistance was made.

After the event, Carson fabricated a story to the police. Investigation revealed a tube of fake blood in the trailer and red stains on the sheetrock made from the fake blood. Finally, Milam gave a recorded statement in which he stated that both he and Carson participated in the acts together.

Carson violated her duty to protect the child by failing to take any action whatsoever to prevent her murder. It was reasonable for a jury to infer that Carson was aware that her conduct (failing to prevent commission of the offense) was reasonably certain to cause the result (death). And, therefore, it is reasonable to conclude Carson acted with intent to promote or assist in the commission of the offense by her total failure to prevent its commission when: (1) the injuries were repeatedly inflicted over a long time-period, (2) the injuries were massive and ongoing, (3) Carson was present for the entire lengthy duration of the torture and saw and heard the great

13

pain and distress of the child, and (4) Carson was alone with the child at times and in a position to remove the child from the danger but took no action to prevent the commission of her murder. This death did not occur in a moment of rage, but was a systematic infliction of torment and suffering lasting over a two-day period. The repeated infliction of such extensive wounds to a very small child was reasonably certain to cause death. The injuries were such that the forensic examiner had never seen anything like it before. Almost every part of the child's body was abused and injured; the death occurred slowly and with excruciating pain.

A culpable mental state generally can be established only by inferences from the acts, words, and conduct of the accused. *Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The surrounding circumstances of this case, when viewed in a light most favorable to the verdict, are legally sufficient to allow a reasonable jury to conclude that Carson intended to promote or assist in the commission of this offense. The jury heard and disregarded Carson's testimony that this entire scenario was only an attempt to exorcise a demon from a thirteen-month-old child. She had repeated opportunities over many hours to attempt to protect the child, but she made no effort. Based on the entirety of the evidence before the jury, the conclusion that Carson was responsible as a party is a reasonable deduction from the record evidence. *See Pumphrey v. State*, No. 05-06-00726-CR, 2007 WL 2052159 (Tex. App.—Dallas July 19, 2007, pet. ref'd) (not designated for publication). While *Pumphrey* is not a reported case and is, therefore, without precedential value, we agree with its reasoning.

The facts of *Pumphrey* are strikingly similar to those of this case. The victim in that case was a five-year-old girl, and Pumphrey was married to the child's mother. Pumphrey and the

14

mother were both convicted of murdering the child. On appeal, Pumphrey claimed that the evidence established that the mother's actions had killed the child and argued that the evidence was insufficient to establish his guilt as a party to the offense. In overruling Pumphrey's point of error, the court reasoned as follows:

> The evidence showed the child was severely and brutally beaten and whipped all over her body in the weeks before she was taken to [the] hospital. The child's injuries would have been obvious to anyone that saw her. During this same time period, appellant and Mother were the only people who saw the child. Appellant admitted awareness of serious abuse inflicted by Mother and also admitted hitting the child himself. Appellant also attempted to explain some of the child's injuries by claiming he had witnessed the child having sexual intercourse with a demon. Additionally, neighbors had overheard appellant yelling from the apartment and specifically telling Mother to do something about the child's misbehavior. Further, when the child stopped breathing, appellant did not call 911, and instead waited until the unconscious child was dressed and Mother took a shower before driving her to the hospital. We conclude there was legally sufficient evidence from which the jury could infer appellant had the intent to promote or assist Mother's commission of the offense.

*Id.* at *3 (citation omitted).

### D.    Proof of "the Unknown Object"

Carson also argues that the allegations raised in the indictment are so far afield from the jury charge that a fatal variance exists that requires reversal, citing *McIver v. State*, 555 S.W.2d 755 (Tex. Crim. App. 1977), as authority. In that case, the Texas Court of Criminal Appeals held that when an indictment alleged a victim was killed by an instrument to the grand jury unknown, the State was required to prove that the grand jury, after efforts to do so, was unable to find out the type of instrument used. The court further held that the failure to offer such proof constituted reversible error. Here, the indictment has multiple paragraphs alleging that the child

15

was murdered by striking with hands, with an object (the exact nature of which was unknown), by striking the child against an object (the exact nature of which was unknown), and by strangling her.

This theory advanced by Carson is known as the "*Hicks*" rule based on *Hicks v. State*, 860 S.W.2d 419 (Tex. Crim. App. 1993). On appeal, Carson briefly argues that the State did not meet its burden to show what inquiry the grand jury made in attempting to ascertain what object was used to cause the child's death. This is a case where the instrument of death was unknown to the grand jury, and the jury was so charged.

This issue has recently been discussed by the Texas Court of Criminal Appeals in *Sanchez v. State*, 376 S.W.3d 767 (Tex. Crim. App. 2012). In that case, the court withdrew a lengthy opinion previously issued in October 2010 and substituted a new opinion. The newly released opinion makes it clear that *Hicks* is no longer valid after *Malik*, 953 S.W.2d 234. In *Malik*, it was determined that the sufficiency of the evidence would be "measured by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Id.* at 240. The court in *Sanchez* found that *Malik* rendered the *Hicks* rule defunct and expressly overruled *Hicks*. *Sanchez*, 376 S.W.3d at 772. A nonessential element of the charge, an immaterial variance, such as an allegation that the object used was unknown to the grand jury, may be properly excluded from the hypothetically correct jury charge, and, therefore, a failure to

16

prove such does not render the evidence insufficient. *See Fagan v. State*, 89 S.W.3d 245, 249 (Tex. App.—Texarkana 2002, pet. ref'd).[5]

### E.    Insufficient Evidence:   Cause of Death

Carson next argues the evidence was insufficient to show that the child was strangled. We disagree.  There is evidence of petechial hemorrhages in her eye and hemorrhage or bleeding in the soft tissue on the right side of her neck, and the forensic examiner testified that these injuries are typical of strangulation.  The evidence shows that strangulation was at least a component of the general injuries to her body.  Because of the extreme nature of the multiple types of injuries highlighted above, it was not conclusively a cause of her death, but provided the jury with sufficient evidence to conclude the child was strangled.

Further, the Texas Court of Criminal Appeals has held that in a capital murder case, if the charge authorizes a jury to convict on more than one theory, the guilty verdict should be upheld if evidence is sufficient on any theory. *Martinez v. State*, 129 S.W.3d 101, 106 (Tex. Crim. App. 2004).  The evidence is without question sufficient to prove that the child was beaten to death in one of several ways.  Thus, even if the evidence of strangulation were insufficient, we would find the evidence sufficient on other grounds.  The contention of error is overruled.

---

[5]Even if the *Hicks* rule still applied, it would provide Carson no relief.  If the allegation is that the manner or means of inflicting injury was unknown and the evidence at trial does not establish the type of weapon used, a prima facie showing is made that the weapon was unknown to the grand jury. *Hicks*, 860 S.W.2d at 424.  No allegation is made that proper notice of the charges was not provided.

## III.    Mistake of Fact Jury Instruction

Carson next contends that the trial court erred by failing to submit her requested instruction on mistake of fact. Mistake of fact is a statutory defense to prosecution. Section 8.02(a) of the Texas Penal Code states:

> (a)    It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense.

TEX. PENAL CODE ANN. § 8.02(a) (West 2011). Carson argues that because she testified Milam had always acted with loving kindness toward Amora, there was sufficient evidence of a "mistaken belief" about his behavior that negated her culpability to justify giving her requested defensive instruction. A trial court must charge the jury fully and affirmatively on the law applicable to every issue raised by the evidence. TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). If evidence from any source raises a defensive theory, it must be included in the court's charge. *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). However, the defendant is only entitled to an instruction on the issue if there is some evidence (viewed in the light most favorable to appellant) of the defensive theory. *Id.*; *Render v. State*, 347 S.W.3d 905, 922 (Tex. App.—Eastland 2011, pet. ref'd). There is evidence that prior to this occurrence, Carson had no reason to seriously anticipate Milam would act in such a monstrous fashion toward her child. Her testimony was that he had always evinced a loving attitude toward Amora. This case, however, does not consist of a single heinous act during a brief period of time with no reason to anticipate its occurrence.

18

This series of events began with Milam telling Carson that Amora was possessed with a demon. Without any further inquiry into such an unusual claim, Carson allowed Milam to perform an exorcism. The facts have previously been discussed, but the evidence shows that Carson was in the small manufactured home at all times during the infliction of injuries to her child. She saw and heard the child numerous times as the exorcism/torture proceeded, but took no action to investigate the welfare of her child. Carson and Milam drove to Wal-Mart during the night, and she was alone with Amora, but did not further investigate the child. Even the times that she did see Amora, the child's face appeared stretched, warped, and distorted, which should have notified Carson of the harm being inflicted. There is nothing to suggest that Carson had any belief that Milam remained loving and caring in the face of the screams of her child—for some thirty hours of torture. Entertaining such a belief after hours of abuse, but before death was inflicted, would have been patently unreasonable. We are not amenable to the notion that Carson can insulate herself from culpability for Milam's acts because she believed he was torturing Amora for the good of her child—to get the demon out of the child. Thus, any belief Carson might have developed in that context is not reasonable and is, thus, outside the reach of the defense. We find no evidence that would show a mistake of fact relevant to the actual events of this case. Accordingly, we also find no error in refusing the requested instruction. The contention of error is overruled.

## IV. Lesser-Included Offense Jury Instructions

Carson next contends that the trial court erred by not providing the jury with requested lesser-included offense instructions. She requested instructions on criminally negligent

19

homicide, reckless injury to a child, injury to a child through criminal negligence, and injury to a child through omission. On appeal, she claims error because the court did not submit the requested instruction on criminally negligent homicide and reckless injury to a child.[6]

There is no evidence that Carson injured the child as a principal. Any liability Carson has for the acts that ended her child's life stems from her criminal responsibility for the actions of another.

Carson's position on appeal is that the lesser charge should have been given to the jury because her behavior could possibly have been considered reckless or criminally negligent. An offense is a lesser-included offense if:

> (1)     it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

> (2)     it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

> (3)     it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

> (4)     it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006).

---

[6]The jury was charged on several bases—in each instance as a principal and a party.
- Capital murder:  knowingly caused death by striking with hands, a blunt object (unknown) striking victim against a blunt object (unknown) or strangling.
- Murder:  in course of committing a felony, commits act clearly dangerous to human life that causes death.
- Injury to a Child:  intentionally or knowingly caused serious bodily injury to a child by one of the four actions.

A defendant is entitled to a charge on a lesser offense if (1) the lesser offense is included within the proof necessary to establish the offense charged, and (2) there is some evidence that would permit the jury rationally to find that if the defendant is guilty, he or she is guilty only of the lesser offense. *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007); *Guzman v. State*, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006). If a defendant either presents evidence that he or she committed no offense or presents no evidence and there is no evidence otherwise showing the defendant is guilty only of a lesser-included offense, then a charge on a lesser-included offense is not required. *Bignall v. State*, 887 S.W.2d 21, 22–24 (Tex. Crim. App. 1994); *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985). If evidence from any source raises the issue of a lesser-included offense, a charge on that lesser offense must be included in the jury charge, whether the evidence is introduced by the State or the defense and whether it is strong, weak, impeached, or contradicted. *Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985). Evidence raising the issue must be considered within the context of the evidence as a whole. *See Ramos v. State*, 865 S.W.2d 463, 465 (Tex. Crim. App. 1993).

Further, the evidence must establish the lesser-included offense as a valid rational alternative to the charged offense. *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012); *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000). This means that the evidence must allow a jury to rationally conclude that the defendant was guilty only of the lesser offense. *Cavazos*, 382 S.W.3d at 385.

Each requested instruction involves the application of a lesser-culpable mental state, either through criminal negligence or reckless behavior.

21

A person commits the offense of injury to a child by omission by intentionally, knowingly, or recklessly by omission causing a child serious bodily injury when the actor has a legal or statutory duty to act. TEX. PENAL CODE ANN. § 22.04(a), (b) (West Supp. 2012). A person acts recklessly with respect to the result of his or her conduct when that person is aware of, but consciously disregards, a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. TEX. PENAL CODE ANN. § 6.03(c) (West 2011). If the offense is committed recklessly, rather than intentionally or knowingly, it is a felony of the second degree. TEX. PENAL CODE ANN. § 22.04(e) (West Supp. 2012).

It is not sufficient to raise the lesser offense if the jury may have simply disbelieved crucial evidence pertaining to the greater offense. There must be some evidence directly germane to the lesser-included offense to warrant such an instruction. *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997). This standard is satisfied if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations. *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011).

The Texas Court of Criminal Appeals has recently reaffirmed that there are two ways that evidence may indicate that a defendant is guilty of only the lesser offense. "First, evidence may have been raised that refutes or negates other evidence establishing the greater offense. Second, the evidence presented regarding the defendant's awareness of the risk may be subject to two different interpretations, in which case the jury should be instructed on both inferences."

*Cavazos*, 382 S.W.3d at 385.  This standard is couched in the alternatives, and both alternatives are present here.

A primary issue here was whether Carson acted with an intention to promote or assist in the death of the child or whether she was a supremely inferior mother who, being aware of the danger to the child, recklessly abdicated her responsibility and, for whatever reason (such as total dominance by Milam), merely stood by while her child was being assaulted.  Under the jury charge given, the jury was not allowed to consider if Carson acted recklessly, but was only asked whether Carson, individually or as a party, knowingly killed her child or acted intentionally or knowingly to seriously injure her.

Without question, Carson, as the mother of the child, had a legal duty to act to protect her child.  She did nothing to prevent the murder of the child; thus, the only remaining question is whether there is any evidence that Carson acted recklessly rather than intentionally or knowingly.  In other words, was she aware of a substantial and unjustifiable risk of injury to her child (a risk so substantial that to disregard it would be a gross deviation from the standard of care) that she consciously disregarded.  The State argues that the requested instructions were not necessary because no rational jury could have determined that she should have been aware of the risk but consciously disregarded it.  Carson did not admit that she consciously disregarded a substantial risk to the child, but other evidence raises that issue:

- Carson had become submissive to Milam and professed an unwarranted belief that he loved both her and her child and would not harm them;
- Milam controlled Carson and insisted that she cut all ties with her family and friends;

23

- Carson testified she thought the "exorcism" would be helpful to and heal her child; and
- Carson admitted she knew Milam was a registered sex offender, heard horrible cries from the child, saw the child's face in a deformed condition, and still allowed Milam to continue with the exorcism. Traces of the child's blood were found in various parts of the house.

From this evidence, the jury could have concluded that even though Carson originally thought that the exorcism would be helpful to the child, after she heard the cries and saw the distorted face of her child, she became aware that Milam posed a substantial and unjustifiable risk of injury to the child, but instead of confronting Milam, she consciously disregarded that risk and allowed Milam to proceed. She omitted taking any action that could have prevented further assault of the child. A jury could have rationally concluded that Carson acted recklessly by omission when she had a legal duty to act.

The nature of Carson's culpability cannot conclusively be established—whether she acted intentionally or knowingly or whether she recklessly disregarded the substantial risk that Milam had become to her daughter. It is not our role to determine the credibility of this evidence, but neither is it the role of the trial court—that is reserved for the jury. Since this issue was raised by the evidence, it was error to refuse the lesser charge of reckless injury to a child by omission.

## V.    Error Analysis

In an *Almanza* analysis, as the claim of error was preserved, we look only to see if there is some harm to Carson as a result of the error. Having found error in the trial court's jury charge, we evaluate the record to determine whether Carson was harmed. *Hamel v. State*, 916 S.W.2d 491, 494 (Tex. Crim. App. 1996) (citing *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim.

24

App. 1984)).  When the defendant raises a proper objection at trial, reversal is required if the error is reasonably expected to harm the defendant.  *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *Aguilar v. State*, 914 S.W.2d 649, 651 (Tex. App.— Texarkana 1996, no pet.).  The presence of any harm, regardless of degree, is sufficient to require reversal.  *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994).  With no burden of proof, our determination is made simply from a review of the record.  *See Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008); *Ngo v. State*, 175 S.W.3d 738, 750 n.48 (Tex. Crim. App. 2005).  The defendant must have suffered some actual, rather than theoretical, harm from the error.  *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986).

The jury was instructed on the law of capital murder (knowingly caused the death of Amora, a child under six years of age); murder (intentionally or knowingly attempted to commit a felony, to-wit:  injury to a child—an act clearly dangerous to human life that caused the death of Amora); and injury to a child (knowingly caused serious bodily injury to Amora).  The capital murder charge requires a finding that Carson acted knowingly; the murder charge requires that Carson acted intentionally or knowingly; the injury to a child charge requires a finding that her action was done knowingly.  The Texas Court of Criminal Appeals has held that an error in failing to submit a lesser-included charge may not be harmful if an intervening lesser-offense instruction was given to the jury and the jury rejected it.  *Masterson v. State*, 155 S.W.3d 167, 171–72 (Tex. Crim. App. 2005) (court can conclude intervening offense instruction renders charge error harmless if jury's rejection of intervening offense indicates jury legitimately believed defendant guilty of greater, charged offense).

25

The State argues that if error occurred, it is harmless based on this rationale. The *Masterson* case recognized that harm might result from denying lesser-offense instructions if the jury is placed in the dilemma of either convicting the defendant of the greater charge or acquitting her. *Id.* at 171. The intervening lesser charge serves as a possible compromise which would hold the defendant accountable even if the jury rejected the greater offense. This is not true in every instance since the charged intervening offense may be the least plausible alternative, but if the court concludes that the rejection of an intervening charge demonstrates the jury legitimately believed the defendant was guilty of the greater charge, the failure to instruct the jury on the additional lesser charge may be harmless error. *Id.*

In most of the cited cases, the lesser offense that was rejected by the jury involved a lesser mens rea requirement. *Saunders v. State*, 913 S.W.2d 564 (Tex. Crim. App. 1995) (jury rejected lesser offense of involuntary manslaughter (recklessness) so unnecessary to submit negligent homicide); *see also Orona v. State*, 341 S.W.3d 452 (Tex. App.—Fort Worth 2011, no pet.); *Stafford v. State*, 248 S.W.3d 400 (Tex. App.—Beaumont 2008, pet. ref'd); *Levan v. State*, 93 S.W.3d 581 (Tex. App.—Eastland 2002, pet. ref'd).

But not always. In *Partida v. State*, 279 S.W.3d 801 (Tex. App.—Amarillo 2007, pet. ref'd), the defendant was charged with aggravated assault of a public servant. TEX. PENAL CODE ANN. § 22.02(b) (2) (A) (West 2011). Partida requested a charge of recklessly committing deadly conduct, *see* TEX. PENAL CODE ANN. § 22.05(a) (West 2011), but was only given the lesser charge of knowingly committing deadly conduct, *see* TEX. PENAL CODE ANN. § 22.05(b) (1)–(2) (West 2011). *Partida*, 279 S.W.3d at 804. The Amarillo court found that the jury's

rejection of the lesser offense showed that the jury had no reservation about Partida's guilt of the greater offense.

Here, the jury had three options:

(1)     Capital murder–knowingly cause death–(being reasonably certain her conduct would result in death of the child)
(2)     Murder–by knowingly committing or attempting to commit the felony offense of Injury to a Child and in such action committing or attempting to commit an act clearly dangerous to human life.
(3)     Injury to a child–knowingly causing serious bodily injury

Carson testified that she had no intention to harm the child and did not think Milam would do so. The jury was not placed in a position of either convicting Carson of capital murder or acquiting her. If Carson's testimony had been believed by the jury, she would not have been guilty of intentionally, knowingly, or recklessly committing any offense whatsoever. Here, the jury had the opportunity to consider whether her conduct was something less than a showing that Carson was reasonably certain her conduct would cause the death of the child. As suggested in *Masterson*, a compromise was available had the jury had an inclination that the evidence did not rise to the level required for capital murder. Had the jury thought Carson was not reasonably certain her actions would result in the death of the child, it could have found that she only intended to commit an injury to the child and that her action was clearly dangerous to life and found her guilty of murder only. Further, if the jury had been convinced that the only offense was injury to a child without the added element of committing a clearly dangerous act, it could have found her guilty of the lesser offense of injury to a child, a first degree felony.

27

When the jury was selected, it was made abundantly clear that murder was an offense the law considered to be lesser than capital murder. This being a capital murder case where the State had waived the death penalty possibility, the jury was informed by the trial judge that if Carson was convicted, the only punishment option was life without parole. The trial judge also explained that a conviction for murder did not involve the possibility of life without parole. The jury was informed that the offense of murder had a punishment range of five years to ninety-nine years or life imprisonment. By its verdict in rejecting consideration of either of the lesser-included charges, the jury manifested its clear and legitimate belief that Carson was guilty of the greater offense, capital murder. Under such circumstances, we find the error was harmless.

## VI.     Cruel and Unusual Punishment

Carson next contends that her assessed punishment of life without possibility of parole violates the United States and Texas Constitutions as cruel and unusual punishment—violative of the Due Process and Equal Protection Clauses.

To preserve error for appellate review, a defendant must make a timely, specific objection and obtain a ruling from the trial court. TEX. R. APP. P. 33.1. This requirement applies even to assertions that a sentence is cruel and unusual. *Richardson v. State*, 328 S.W.3d 61, 72 (Tex. App.—Fort Worth 2010, pet. ref'd) (citing *Solis v. State*, 945 S.W.2d 300, 301 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd); *Jackson v. State*, 989 S.W.2d 842, 844 n.3 (Tex. App.—Texarkana 1999, no pet.); *Henderson v. State*, 962 S.W.2d 544, 558 (Tex. Crim. App. 1997)).

In this case, there was no objection on that basis at trial, and it was not raised by motion for new trial. In such a case, the issue is not preserved for our review. The contention of error is overruled.

The trial court erred in failing to submit a properly raised lesser-included charge. However, we find the error harmless.

We affirm the judgment of the trial court.


Jack Carter
Justice

Date Submitted:     May 15, 2012
Date Decided:       February 1, 2013

Publish