

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00148-CR

GINGER PARKER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Marion County, Texas
Trial Court No. F15747

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

## MEMORANDUM OPINION

A Marion County jury found Ginger Parker guilty of assault against a peace officer, a second-degree felony, and assessed a sentence of seventeen years' imprisonment and a $17.00 fine. *See* TEX. PENAL CODE ANN. § 22.01(b-2) (Supp.). On appeal, Parker argues that the jury's verdict was not supported by legally sufficient evidence, she was egregiously harmed by the lack of an extraneous-offense instruction in the jury charge, her counsel rendered ineffective assistance, and her sentence violated the Eighth Amendment[1] because it was grossly disproportionate to her offense.

We find that (1) the jury's verdict was supported by legally sufficient evidence, (2) there was no jury-charge error, (3) the silent record does not support Parker's claim of ineffective assistance, and (4) Parker did not preserve her Eighth Amendment complaint. As a result, we affirm the trial court's judgment.

## I. The Jury's Verdict Was Supported by Legally Sufficient Evidence

In her first point of error, Parker argues that the evidence was legally insufficient for the jury to find that she intentionally, knowingly, or recklessly committed the crime because she testified that she had "blacked out" during the assault and did not remember committing it. Because the jury was well within its purview to reject Parker's self-serving testimony in favor of the State's evidence showing that Parker had the required mens rea when committing the offense, we reject Parker's argument.

---

[1]*See* U.S. CONST. amend. VIII.

### A.  Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt."  *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)).  "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented."  *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)).  "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge."  *Id.* at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'"  *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Here, the State's indictment alleged that Parker "intentionally, knowingly, or recklessly cause[d] bodily injury to BRANT SMITH . . . by kicking him in the groin and thigh" and that Parker "knew that the complainant was a peace officer and the complainant was lawfully discharging an official duty, namely the arrest of Ginger Parker."

**B.    The Evidence at Trial**

Roy Stephenson, the owner of The Pines Café, testified that Glinda Barron, an employee of a neighboring business called Milano's Grocery Store, reported a suspicious vehicle parked behind the dumpster of the cafe when it was closed. Stephenson drove to the cafe, saw the vehicle with all four windows down, and believed it was unoccupied. As a result, Stephenson called Brant Smith, a trooper with the Texas Department of Public Safety, to "run a check on" the vehicle. Smith asked Stephenson to check if anyone was in the vehicle.

Stephenson testified that, when he walked up to the car shining a flashlight, Parker, who was in the backseat, "c[a]me out [of] the window on [him], like attacking [him]" "like the exorcist." He explained, "There w[ere] scratches and stuff . . . pretty much all over me. . . . It all happened so quick." Stevenson also testified that Parker punched him, bit him, spit blood on him, "smacked [him] in the eye" with his cell phone, and then threw the phone as far as she could. Stephenson showed photos of his bloodied injuries to the jury but clarified that some of the blood might have been Parker's because her mouth was bleeding, possibly from "some kind of infection."

According to Stephenson, Parker took Barron's phone "and hit [Barron] with her phone. And just -- everybody that drove up, [Parker] started attacking them, just one after another, and

4

she wouldn't quit." Barron testified that she "blacked out" after Parker hit her in the face with her phone but remembered that Parker spat blood "down [her] throat." Stephenson testified that Barron's "eye was instantly black and purple." The jury saw photos of Barron's injuries and bruising.

Stephenson's wife, Sandra, testified that Stephenson and Barron had been attacked and their phones shattered by the time she arrived on the scene. According to Sandra, Parker recognized her as her bail bondswoman and said, "I'm not ever going to f***ing court," and started attacking her.[2] Sandra testified that Parker, who smelled like "a lot of alcohol," held her to the ground, ripped out chunks of her hair, spat blood in her face, and bit her. Sandra said, "[I]t was just crazy. Probably the craziest thing I've ever dealt with." The jury saw photos of Sandra's injuries, including three broken toes.

Sandra and Stephenson testified that, when their nephew, Jacob Burleson, arrived at the scene, "[Parker] turned on [Burleson] and hit him in the face." Burleson testified that he pulled Parker off of Sandra, that Parker hit him and spit blood on him, and that he hit Parker in the face, but she was not phased. Burleson said that Parker returned to assaulting Sandra.

While Sandra was being attacked, Smith arrived at the scene in a marked patrol unit with lights flashing and sirens blaring and exited the patrol car wearing his uniform. The State played for the jury Smith's body-camera footage showing Parker's assault of Sandra. Smith broke up the fight and told Parker that she was under arrest. Smith testified that he believed Parker was

---

[2]Stephenson testified that, when Sandra arrived at the scene, Parker "immediately knew that [Sandra] was her bondsman so she attacked her and grabbed her by the hair[,] . . . pulled just chunks of hair out of her head[,]" and kept "just attacking her." According to Stephenson, after Sandra answered in the affirmative, Parker said, "Well, I ain't never pay another F'ing dime," before attacking her.

"extremely intoxicated" because of her belligerence and immunity to "pain compliance." Based on his training, Smith believed Parker "was under the influence of a mixture of alcohol and methamphetamine."

Sandra testified that Smith handcuffed Parker and placed her in the front seat of Smith's patrol car, but Parker was able to escape by exiting the car and running into some nearby woods. Joshua Cox, a patrol officer with the Jefferson Police Department, testified that Smith asked for assistance after Parker escaped. Cox testified that he located Parker, who "was talking excessively, claiming that she was the one that was assaulted." According to Cox, Parker was "very resistant," agitated, and excitable, which seemed abnormal.

Cox re-apprehended Parker, who was still handcuffed. Cox said that, while Smith was attempting to secure Parker inside of his patrol car, she "became very combative, very resistive, still verbal, kicking, screaming, cursing." Cox testified that, during the scuffle, he "observed . . . one of her feet come up and make contact with . . . Smith's groin." Stephenson also testified that he saw when Parker "kicked Officer Smith in the groin and then he hollered for help." Sandra said that Parker's assault "brought [Smith] to his knees."

Smith's body-camera footage shows Parker's belligerent behavior after she was re-apprehended by Cox. She continued to argue with the officers, who struggled to restrain her enough to place her in Smith's patrol car. Smith was able to secure Parker in the front seat of his car, but she was able to get out of the car again, prompting officers to join Smith's attempt to secure her in a different patrol unit. Although it was too dark to see Parker's assault of Smith on the recording, Smith can be heard exclaiming, "[Y]ou hit me in the crotch" and that Parker

6

responded by claiming it was an accident. Smith testified that Parker "kicked [him] in the groin and in the top of the thigh, around the pelvis area and groin." Parker was placed in leg restraints before she was transported to jail. When asked about Parker's behavior, Smith testified that her actions were "absolutely intentional."

Parker, who was thirty-eight at trial, chose to testify in her defense by explaining that she suffered from post-traumatic stress disorder (PTSD) and did not have the mens rea required for the crime since she had blacked out during the incident. She testified that she was sexually assaulted by her great-grandfather for approximately five years when she was a young child. Parker said she received mental-health treatment as a child and "was admitted into an institution" when she was eleven, although she could not name which one. Parker told the jury she moved with her grandmother to Iowa when she was thirteen and was abducted by five men, was held by them for three days, was sexually abused, and "was in a coma for 10 days afterwards." Parker testified that her abductors released her after the news reported her missing. Parker also said that her first husband was abusive. According to Parker, she was placed in a mental-health hospital a total of nine times, including Rusk State Hospital, and was twenty-two when she was last hospitalized. Parker testified that she had a counselor, was diagnosed with chronic PTSD, and had been prescribed several psychoactive medications, which she had not taken for at least the last ten years.

As for the incident in question, Parker testified that she ended up behind the cafe because she had run out of gas and planned to sleep in the backseat of her car until she could get gas the next morning. According to Parker, Stephenson approached her to ask why she was parked

7

behind the dumpster and, after Parker said she had run out of gas, Stephenson told her to "get the F out of there." Parker claimed she did not exit her vehicle until she recognized Sandy as her bondswoman. According to Parker, Stephenson was the first to punch her in the face, causing a bloody lip. Parker testified that "everything went black" after she was hit and that she did not know what happened after that.

Parker claimed that she revived only after she was "in a vehicle" and that she started running and hid. Parker said that she saw police officers coming toward her, "blacked out again," and did not remember anything until she was already in jail. She denied taking any drugs or alcohol on the day of the incident and instead claimed that the blackouts were due to her PTSD.

To counter Parker's testimony, Stephenson testified that Parker hit him first but agreed that he might have hit her in defending himself. Smith testified that Parker had a "busted lip," but he saw no visible marks or injuries on her after she was "cleaned up" while at the jail. Smith testified that Parker's criminal history indicated that she had violent tendencies. He also said there was no indication that Parker had been attacked.

During her direct testimony, Parker admitted that she had received speeding tickets, had been convicted of burglary, had assault and marihuana charges, was charged with unauthorized use of a motor vehicle, was charged with terroristic threat, and had been arrested several times. During cross-examination, Parker also admitted that she had been convicted of harassment in 2007, criminal mischief in 2010, possession of marihuana in 2011, burglary of a habitation in 2013, and family violence assault in 2021 and that she had been arrested for assaulting her

8

mother and resisting arrest. She agreed that she had seventeen convictions or arrests. Parker also "guess[ed]" that she had been convicted for assault in 2010 and could not dispute whether she was convicted of resisting arrest.

In rebuttal, the State called two witnesses. Susan Laake said that, when working with the Lone Star Police Department, she arrested Parker on an outstanding warrant in 2015. Laake testified that Parker resisted arrest and was "very combative." Laake recalled that Parker had "spit phlegm, saliva, and vomit at [her,] striking [her] on the right side of [her] face, neck, and shoulder area." Laake testified that Parker had to be further restrained and that she was forced to pull Parker's shirt over her face because Parker was "continually trying to spit and curs[e]."

Brett Smith, a deputy with the Marion County Sheriff's Office, testified that he and Deputy Jake Munoz were dispatched to the home of Mackey Pitts, Parker's neighbor, in March 2022 after Parker "had threatened to kill [Pitts], his wife, his dogs, and burn down his home." Pitts testified that he believed Parker when she made that threat. When Brett and Munoz confronted Parker about the threat on her front porch, she fled inside of her home and released several dogs that were "some breed of pit bull" on them. Brett testified that he had to fire a weapon toward the dogs to prevent an attack, which had given Parker time to flee her residence. Pitts testified that Parker would disturb the peace of the neighborhood by yelling and screaming.

Brett and Munoz testified that, in June 2022, they were dispatched to speak with the owner of a vehicle who suspected that Parker had stolen it. Brett and Munoz testified that the vehicle was found abandoned on the side of an interstate, but Parker was arrested because Munoz

9

had seen Parker driving the vehicle earlier that day and she fled at a high rate of speed when Munoz tried to stop her.

After hearing the evidence, the jury convicted Parker of assault of a peace officer.

**C.     Analysis**

Parker acknowledges that the evidence shows she kicked Smith in the groin and thigh while he was attempting to detain and arrest her and that she knew he was a police officer. Even so, she argues that the evidence is insufficient to show that she did so intentionally, knowingly, or recklessly because of her PTSD-related dissociation. We find there was ample evidence that Parker acted recklessly, at a minimum.

"A person acts recklessly, or is reckless, with respect to . . . the result of h[er] conduct when [s]he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." TEX. PENAL CODE ANN. § 6.03(c); *see Ex parte Rion*, 662 S.W.3d 890, 900 (Tex. Crim. App. 2022) (finding that assault is a result of conduct offense).

"[A] culpable mental state generally can be established only by inferences from the acts, words, and conduct of the accused." *Erwin v. State*, 578 S.W.3d 182, 186 (Tex. App.— Texarkana 2019, no pet.) (alteration in original) (quoting *Carson v. State*, 422 S.W.3d 733, 743 (Tex. App.—Texarkana 2013, pet. ref'd)). To determine mens rea, "we should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012)).

10

Parker admitted to the jury that she had a past criminal history involving assault, harassment, and terroristic threat. The jury heard testimony from Laake, Brett, and Munoz that Parker also had a history of non-compliance with police officers. Laake testified that Parker had spat and vomited on her and continuously attempted to spit on her and others until her shirt was pulled over her head. Brett and Munoz testified that, in complete disregard for their safety, Parker had released her dogs on them to allow her to escape custody.

As for the incident in question, Stephenson, Barron, Sandra, and Burleson all testified that Parker had assaulted them. All except for Burleson said that, like the past incident with Laake, Parker spat on them. When Smith arrived at the scene, Parker failed to comply with his instructions and resisted arrest. As she had done with Brett and Munoz, Parker escaped custody. When she was re-apprehended, she continued to resist arrest and fought against being placed in the patrol car. It was during that resistance that Parker kicked Smith. The jury was able to view Parker's demeanor on Smith's body-camera footage. Although Parker claimed that she had "blacked out," the jury was free to reject her self-serving testimony. Instead, the jury was free to find that Parker was aware that there was a substantial and unjustifiable risk that she could injure Smith by continuing to physically resist so she could escape but consciously disregarded that risk by kicking her feet toward his groin. Further, although the State's minimum requirement was to establish Parker's recklessness, the jury could have also believed Smith's testimony that Parker "absolutely intentional[ly]" kicked him based on the body-camera footage and her history of assault, escape, and disregard for officer safety.

11

We find that the State presented legally sufficient evidence of Parker's mens rea. As a result, we overrule Parker's first point of error.

## II.      There Was No Jury-Charge Error

In her second point of error, Parker argues that the trial court erred by failing to submit an extraneous-offense instruction during guilt/innocence.

"We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.)).

As always, "the jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13. A trial court must submit a charge "setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14. "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application." *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)). "It is not the function of the charge merely to avoid misleading or confusing the jury[;] it is the function of the charge to lead and prevent confusion." *Id.* (quoting *Delgado*, 235 S.W.3d at 249).

That said, in *Delgado*, the Texas Court of Criminal Appeals expressly rejected the argument that a trial court must sua sponte include an extraneous-offence instruction in the

12

guilt/innocence jury charge. *Delgado v. State*, 235 S.W.3d 244, 246 (Tex. Crim. App. 2007). Instead, the Court of Criminal Appeals determined that such an instruction is only required at guilt/innocence when requested by the defendant. *Id.* The court further clarified,

> [A] limiting instruction concerning the use of extraneous offense evidence should be requested, and given, in the guilt-stage jury charge only if the defendant requested a limiting instruction at the time the evidence was first admitted. When the defendant has properly requested a limiting instruction in the jury charge, the trial court must also include an instruction on the State's burden of proof at that time.

*Id.* at 251.

Here, because no limiting instruction was requested by Parker, the trial court had no sua sponte duty during guilt/innocence to include an instruction that the State had to prove Parker's extraneous offenses beyond a reasonable doubt. *See id.* at 249; *see Evans v. State*, No. 06-16-00064-CR, 2017 WL 1089806, at *9 (Tex. App.—Texarkana Mar. 22, 2017, pet. ref'd) (mem. op., not designated for publication). Accordingly, we find that the trial court did not err by omitting an extraneous-offense instruction during guilt/innocence. We overrule Parker's second point of error.

## III. The Silent Record Does Not Support Parker's Claim of Ineffective Assistance

In her third point of error, Parker argues that her counsel rendered ineffective assistance because he failed to request a jury instruction regarding extraneous offenses, consult with or obtain an expert, or request a continuance for the purpose of obtaining medical records or an expert.

13

**A.     Standard of Review**

The Sixth Amendment to the United States Constitution guarantees an accused the right to reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). We "look to the totality of the representation" in evaluating the effectiveness of counsel. *Auld v. State*, 652 S.W.3d 95, 113 (Tex. App.—Texarkana 2022, no pet.). As many cases have noted, the right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). "[T]o prevail on a claim of ineffective assistance of counsel, [the defendant] must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, [687–88] . . . (1984)." *Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009) (orig. proceeding). A failure to make a showing under either prong of the *Strickland* test defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).

Under the two-prong test to prove ineffective assistance of her counsel, Parker must show (1) that trial counsel's representation fell below an objective standard of reasonableness, based on prevailing professional norms, and (2) that there is a reasonable probability that the result of the proceeding would have been different but for trial counsel's deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687–95 (1984); *Hernandez v. State*, 726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986).

**B.     Analysis**

Under the first *Strickland* prong, "the defendant must prove, by a preponderance of the evidence, that there is . . . no plausible professional reason for a specific act or omission." *Bone*

*v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Accordingly, judicial scrutiny of counsel's performance must be highly deferential, and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). We apply a strong presumption that trial counsel was competent and presume that counsel's actions and decisions were reasonably professional and motivated by sound trial strategy. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Also, when an appellate record is silent on why trial counsel failed to take certain actions, "the appellant has failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable." *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007); *see Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

As for Parker's complaint that counsel rendered ineffective assistance by failing to request an extraneous-offense instruction, the Texas Court of Criminal Appeals has noted that, when it comes to extraneous-offense instructions during guilt/innocence, "a party might well intentionally forego a limiting instruction as part of its 'deliberate . . . trial strategy to minimize the jury's recollection of the unfavorable evidence.'" *Delgado*, 235 S.W.3d at 250 (quoting *United States v. Johnson*, 46 F.3d 1166, 1171 (1995)). Because Parker's counsel could have chosen to employ this trial strategy, and the silent record fails to show otherwise, Parker has failed to rebut the presumption that her counsel's decision was reasonable.

As for Parker's complaint regarding failure to consult with or obtain an expert or request a continuance for the purpose of obtaining said expert and her medical records, we also find that

15

the silent record compels our rejection of Parker's argument. While it is true that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U.S. at 691, Parker does not claim that her counsel failed to obtain her medical records, and "the record is silent as to what investigative steps counsel took and what conclusions he may have subsequently drawn," *Guillory v. State*, 652 S.W.3d 499, 505 (Tex. App.—Houston [14th Dist.] 2022, order on reh'g) (per curiam). As a result, "[w]e will not assume that counsel did not investigate a defense when the record is merely silent as to the depth of counsel's investigation." *Brown v. State*, 129 S.W.3d 762, 767 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

It is entirely possible that counsel thoroughly investigated Parker's mental-health history and made a tactical decision not to present the evidence because the records discovered contained unfavorable information. For example, the medical records could have refuted that Parker was prone to blackout due to PTSD and could have instead shown that any mental illness was brought on by drug use. In sum, counsel could have reviewed Parker's records and decided that presenting them or obtaining an expert to discuss them could have further harmed Parker.[3]

Because we find that the silent record precludes a finding that Parker's counsel rendered ineffective assistance, we find that the first *Strickland* prong has not been met. As a result, we overrule Parker's third point of error.

---

[3]Moreover, Parker's claim must fail absent a showing of what her medical records or expert testimony "would have revealed that reasonably could have changed the result of the case." *Guillory*, 652 S.W.3d at 505.

16

## IV.    Parker Did Not Preserve Her Eighth Amendment Complaint

In her last point of error, Parker argues that her seventeen-year-sentence is disproportionate to her offense.  "To preserve for appellate review a complaint that a sentence is grossly disproportionate, constituting cruel and unusual punishment, a defendant must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired."  *Navarro v. State*, 588 S.W.3d 689, 690 (Tex. App.—Texarkana 2019, no pet.) (quoting *Russell v. State*, 341 S.W.3d 526, 527 (Tex. App.—Fort Worth 2011, no pet.)); *see* TEX. R. APP. P. 33.1; *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999) (per curiam); *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995); *Duren v. State*, 87 S.W.3d 719, 732 (Tex. App.—Texarkana 2002, pet. struck).  Further, the trial court must have "ruled on the request, objection, or motion, either expressly or implicitly," or the complaining party must have objected to the trial court's refusal to rule.  TEX. R. APP. P. 33.1(a)(2).

Here, the appellate record shows that Parker did not raise any Eighth Amendment complaint with the trial court.  As a result, she has failed to preserve her last point of error for our review, and we overrule it.

## V.      Conclusion

We affirm the trial court's judgment.


Scott E. Stevens
Chief Justice

Date Submitted:      April 29, 2025
Date Decided:        May 19, 2025

Do Not Publish