

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00362-CR
No. 02-18-00363-CR

_____

ALEXIS BOTELLO, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court Nos. 1376941D, 1376957D

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Alexis Botello appeals her convictions for capital murder of a child, injury to a child by omission, and tampering with evidence with intent to impair a human corpse. In four points, Botello argues that the evidence is insufficient to support each of her convictions and that the trial court erred by not allowing her to call two witnesses to testify that Botello's boyfriend had a habit of being abusive and controlling. We will affirm.

### II. BACKGROUND

This case involves the murder of an eighteen-month-old girl, Jane.[1] During the last few weeks of Jane's life, Botello's boyfriend, Joshua Beard, whom Botello and Jane lived with, repeatedly and physically abused Jane until ultimately on July 4, 2014, he stomped her to death. Beard and Botello then buried Jane's body in a shallow grave near Poolville. In a separate trial, a jury convicted Beard of the capital murder of Jane, and he is now serving a life sentence. In connection with Jane's death, the State charged Botello with the three offenses she now appeals.

### A. Beard's Aunt Testifies

At trial, Trina McKenzie testified that she is Beard's aunt by marriage. According to McKenzie, Botello and Jane moved in with Beard in Arlington prior to

---

[1]We are using an alias for the minor victim in this case.

June 2014. McKenzie said that Beard, Botello, and Jane had visited for dinner throughout the month of June but that later in the month, Beard and Botello had no longer brought Jane with them. When McKenzie asked where Jane was, Beard and Botello said that Jane was staying with Botello's mother.

McKenzie averred that she had received a call from the Arlington City Jail on July 6, 2014. It was Beard, who asked her to contact Botello to bail him out of jail. McKenzie said that she had asked Beard where Jane was and that after initially giving her the wrong motel information, he explained that Jane was at a motel in Arlington with Botello. McKenzie called Botello's mother to ask if she had recently seen Jane, and Botello's mother said that she had not seen Jane for more than a month.

McKenzie proceeded to the motel and asked the manager whether Botello was there and if there was a child with her. After the manager informed McKenzie that Botello did not have a child with her, McKenzie walked outside and saw Botello sitting in her car talking on her cell phone. McKenzie approached Botello and asked where Jane was. By McKenzie's account, Botello did not look at her; instead, she simply looked down.

McKenzie pressed her question about Jane again, and Botello said that Jane was staying with a friend in Houston. Not believing that, McKenzie took Botello's phone and car keys and learned that Botello's mother was on the other end of the call "freaking out [and] screaming." According to McKenzie, at no time during her

3

conversation with Botello did Botello suggest that she was afraid of Beard or that she did not feel safe enough to get away from him.

McKenzie then called 911. McKenzie said that as she frantically made her 911 call, Botello remained calm. The State introduced and published for the jury the audio of McKenzie's 911 call. In the call, McKenzie explained to the 911 operator that she had not seen Jane for a month, that Botello had been lying to her about Jane's staying with Botello's mother, and that she (McKenzie) knew that Botello was lying about where Jane was at that moment because Botello could not provide a number to the person with whom Jane was allegedly staying. McKenzie asked that the police be dispatched to the motel.

After speaking with the police at the motel, McKenzie said that she then proceeded to Beard's house to look for Jane. Because someone had previously kicked in the door at the house, McKenzie was able to go inside and look around for Jane, but McKenzie's search was to no avail.

From there, McKenzie went back to her own house to meet up with Botello's mother, and the two of them went back to the motel. They arrived as police were placing Botello in the back of a patrol vehicle.

## B.    Officers Respond to McKenzie's 911 Call

Lynette Hoerig, a Peace Officer for the City of Arlington, testified that she responded to the 911 dispatch. When Hoerig arrived at the motel, she said that she first spoke with McKenzie, who informed Hoerig that Jane was missing. Hoerig

4

testified that another officer made contact with Botello. Hoerig described McKenzie as being "pretty upset [and] very concerned" about Jane's whereabouts. Hoerig said that after speaking with McKenzie, she approached Botello, who was sitting in her car with her door open. By Hoerig's account, Botello began to "pretend to cry," but there were no "real tears or . . . emotion behind it." Hoerig asked Botello where Jane was, and Botello said that she did not know. Hoerig said that she then asked Botello when she had last seen Jane, and Botello said two days prior on July 4, 2014, at Beard's house. Because Botello was being less than responsive, Hoerig asked Botello if she was okay. Botello responded, "He said he didn't mean to do it." Hoerig then asked, "Who was he, and did what?" Botello responded that "he" was Beard but that she could not tell Hoerig what had happened because she had promised Beard not to say. According to Hoerig, Botello was still very "unemotional" and "nonchalant."

After Hoerig described her concern about Jane, Botello responded that she could not "believe [that Jane] was gone." Hoerig said that Botello then reached into her purse, produced a picture of Jane, and then "started crying [with] some emotion [and] tears." Botello kept repeating, "I can't believe she's gone." But Botello still said that she did not know where Jane was.

According to Hoerig, Botello then explained how Beard had pushed and hit Jane and that she had tried to calm Beard down but that Beard had continued to push and hit Jane. Hoerig said that Botello had told her that Beard had felt that Jane "was starting it with him and giving him that look" and that Beard had said that he was

5

"going to finish it." Botello told Hoerig that she had begged Beard to go to sleep, and once he did, she put Jane in her room. Initially, Botello told Hoerig that when she and Beard had awakened the next day, Jane was gone. Botello also told Hoerig that the last time she had seen Jane, she was not alive.

After conferring with her commanding officer, Hoerig again asked Botello what had transpired. According to Hoerig, Botello gave a more descriptive explanation the second time. Botello explained that she had awakened at 4:00 a.m. on July 4 to the sound of Jane's crying as Beard was in Jane's room hitting her. Botello convinced Beard to go back to bed, but hours later, Beard told Botello to "go get the little demon." When Botello went to gather Jane, she noticed that Jane had bruises on her wrists, chest, arms, and legs. After Botello picked up Jane, she saw that Jane's bottom was swollen and that she had bite marks all over her, including on the top of her feet. Jane also had cuts on her lips. Botello told Hoerig that Beard had said that the cuts on Jane's lips "meant something because it looked like an upside-down cross."

Botello explained to Hoerig that as she had begun to feed Jane, Beard had said, "She's doing it again. She's giving me that look." From there, Beard threw Jane's food across the room, and he began hitting and pushing Jane again. Botello said that she had tried to intervene but that Beard had struck her, so she had "backed off." Beard then did something to Jane's neck that made her barely able to stand, and Botello took Jane back to Jane's room and laid her down. Botello noticed that Jane

6

was staring at her but not responding to her questions. Botello conveyed to Hoerig that from there, Beard had told her to give Jane a bath. As Botello was bathing Jane, Beard allegedly came and grabbed Jane from the bath and threw her on the bed with such force that she bounced off the bed and fell onto the floor. Beard then began to repeatedly stomp on Jane to the point that she began to vomit green bile. Botello told Hoerig that she had tried to find Beard's "stun gun" to use on him to get him to stop, but Beard then started hitting and choking Botello to the point that her eyes went blurry and that she could not breathe. Hoerig said that as Botello had described these events, Botello was "talking as if she [was] just telling a story" and that she had "no emotion behind it."

Botello told Hoerig that after Beard had choked her, he went back into Jane's room and began yelling for Botello to "come here quick." Botello arrived at the room to see Beard attempting CPR on Jane. Botello also attempted CPR to no avail and then said to Beard, "Look what you did to my baby." According to Hoerig, that was the end of Botello's story. Hoerig said that at no time during her story did Botello convey that she had attempted to contact a family member, a neighbor, the police, or any type of emergency services to help Jane.

Hoerig asked Botello where Jane's body was, and Botello told her that she was buried under a bridge in Poolville next to a stream.[2] Hoerig said that she had then placed Botello in the back of her patrol vehicle and had informed Botello that she was not under arrest but that she was being detained because she could help police locate Jane's body. Because Botello had told Hoerig that Beard had also assaulted her two days prior, Hoerig examined Botello, especially her neck area, and found "no marks whatsoever." The State introduced and published to the jury pictures of Botello taken on July 6, 2014, and Hoerig averred that they accurately depicted Botello on that day.

While at the motel, Hoerig also spoke with Botello's mother. Botello's mother said that she had not seen Jane since May 28, 2014, and that because Botello had done some things with Jane that she did not approve of, she (Botello's mother) had offered to care for Jane so that Botello "could have time to get her partying out." Hoerig described Botello's mother's demeanor as "extremely upset."

## C. Beard's Location the Early Morning of July 4, 2014

Rachael Jameson testified that she had previously dated Beard and had kept in contact with him. Jameson said that she had learned from Beard that he was dating Botello. According to Jameson, in the early morning of July 4, between 3:00 and 4:00 a.m., Beard called her and asked her to meet him at her parents' house, so she did.

---

[2]Although Botello often referenced Smallville, Texas, during her multiple interactions with the police, the State put on evidence at trial that the location of the bridge under which Jane's body was buried was in Poolville, Texas.

Jameson said that she had met him there, that he was alone, and that she and Beard had engaged in conversation for more than an hour before he left. Jameson averred that the conversation was about Beard's displeasure in dating Botello and that she (Jameson) had advised him to leave the relationship.

## D.     Police go to Beard's House

Arlington Police Department Sergeant Tarik Muslimovic testified that he had gone to Beard's house on July 4, 2014, regarding a narcotics complaint. After having a fifteen-minute conversation with Beard, Muslimovic left. But later he received a 911 dispatch and returned to the house. No one was home. After learning that Beard had outstanding warrants, Muslimovic and another officer returned to Beard's house on July 5, 2014, and arrested Beard. Once Muslimovic placed Beard into a patrol vehicle, Muslimovic said that he returned to the house to speak with Botello about why he had arrested Beard and about his concerns that Beard might be selling marijuana from a home that had a child living in it. Muslimovic said that even though Botello was the one that had informed him of Jane's potential presence there, at no time did Botello mention that Jane was missing or dead. He also said that he had not seen Jane that day and that Botello had not demonstrated any distress nor expressed that she was afraid of Beard. According to Muslimovic, he did not see any obvious bruises or marks indicating that Botello had recently been assaulted.

**E. Botello Accesses a Motel Room Registered to Beard**

Maryssa McClindon, the operations manager for the motel where police detained Botello, testified that Beard had come in on July 5, 2014, and prepaid for a room for a week. According to McClindon, Botello came to the office the next day saying that she needed to get into Beard's room. Even though Botello was not on Beard's registration, McClindon said that she had let Botello into the room because she was able to describe her belongings that were inside the room. McClindon said that Botello had not had a child with her nor had it appeared that there was anything belonging to a child in the room. McClindon also said that at no time had Botello appeared to be in distress, nor had she mentioned anything about a child.

After letting Botello into the room, McClindon said that she had received a call from a woman who had asked whether a person matching Botello's description was at the motel and whether she had a child with her. McClindon said that once the police had arrived, she had stayed "back" and let them conduct their business.

**F. Botello's Injuries on July 6, 2014**

Christine Kringen, formerly of the Arlington Police Department, testified that she had taken photographs of Botello's extremities on July 6, 2014. While the State admitted and published the photographs to the jury, Kringen described how she had taken pictures of multiple bruises on Botello's legs and of one bruise on her right forearm. Kringen averred, however, that she could not tell where the bruises had come from or how old they were when she took the pictures. Kringen said that

despite Botello's having told her that she was experiencing pain in her lower back and around her neck, she did not observe any visible injuries to those areas. Kringen took pictures of those areas, and those pictures were admitted and were published to the jury.

## G. Lopez's Investigation

Sergeant Benjamin Lopez of the Arlington Police Department testified that he was assigned to investigate Jane's death on July 6, 2014. Lopez said that he and a fellow officer had interviewed Botello at 3:45 p.m. that day. During the interview, Botello claimed again that Beard had choked her, so Lopez requested that Kringen photograph her alleged injuries. Botello also told the officers where Jane's body was buried.

Lopez, Botello, and two other officers then went to the burial site. While at the site, Botello showed Lopez where the shovels they had used to bury Jane were hidden. Because it was getting dark by the time they arrived at the site, Lopez delayed having Jane's body exhumed until the following day. The next day, Lopez and other officers went to the site and watched the medical examiner exhume Jane's body.

Later that day, Lopez went to Walmart to obtain surveillance video because he had learned from Botello that she and Beard had purchased shovels and gloves there to assist them in burying Jane's body. While Lopez was on the stand, the State introduced a receipt that he said had been issued to Beard and Botello the day that

they had purchased the items. The receipt showed the purchase of two shovels and two pairs of gloves.

Also while Lopez was on the stand, the State admitted and published for the jury surveillance footage showing Beard and Botello going into Walmart. The footage showed Beard and Botello pulling into the parking lot, waiting in the car for a bit after they had parked, and then exiting the vehicle. From there, Beard and Botello walked into the store holding hands. The couple then proceeded to the lawn and garden section of the store. Beard and Botello ultimately purchased shovels and gloves and then returned to their car with them. As the footage played, Lopez pointed out that neither Beard nor Botello had ever touched the shovels with their hands; instead, they had used the gloves or a plastic bag as they carried them. Lopez also said that based on his interview with Botello, Jane's body had been in the trunk of the car at the time the couple went to Walmart.

As part of his investigation, Lopez visited Beard's residence and had a crime scene investigator take numerous pictures demonstrating the condition of the house. The State admitted these photographs and published them for the jury as Lopez described them. Lopez described the house as being in disarray, "[v]ery messy," and littered with trash. He also said that the house had no running water and that there was little to no food. While there, Lopez said that he discovered moving blankets and that this was significant because Botello had stated in her interview that Beard had wrapped Jane's body in a moving blanket and that there were more blankets like it at

12

Beard's house.  Lopez also discovered a baby blanket that had been folded and placed on a shelf in Jane's closet.

Lopez said that when they searched Jane's room, they found a mattress pushed up against the wall, but when they turned it over, it appeared to have several stains on it.  There was also a child's highchair that appeared to have been recently cleaned.

## H.    Botello's First Interview with Police

The State played the video of Botello's first interview.  In this interview, Botello said that on the night of July 3, 2014, Beard had hit, pushed, and thrown Jane against the wall.  Botello said that she had pleaded with him to stop, but that he had hit her as well.  Botello said that she had then pleaded with him to go to bed and that they had done so.  Botello awoke at 4:00 a.m. on July 4, 2014, to find that Beard was in Jane's room hitting her again.  Botello said that she had asked what Jane had done wrong and that Beard had said, "She's giving me that face again."  Botello said that she had begged him to go back to bed but that Beard had started hitting her, calling her names, and telling her that she was a "whore" for "having a baby at sixteen."  As he was yelling at Botello, she noticed that Jane had a cut on her lips.  Beard allegedly said that the mark had looked like an upside-down cross and that it was fitting because Jane was "a demon."

At roughly 9:45 a.m., Botello woke again to Beard's abusing Jane.  Allegedly, he called to Botello and told her that something was wrong with Jane, that Botello needed to get Jane to stop making strange noises, and that Botello needed to make

Jane walk. Botello said that she had tried not to cry because she knew that would make Beard mad, so she had walked out. Beard began hitting Jane again, including throwing her against the wall. Botello said that she had gone back and had tried to stop the abuse but that Beard had started hitting her again, and she claimed that she had blacked out for a moment. She stated that as she had lain on the floor, she had seen Beard go back to abusing Jane. Botello said that she had again pleaded with him that he needed to stop because Jane was begging him to stop in her infant-like way and because Jane's side was so damaged that when Beard had touched it, his handprint had remained for a long time.

Botello said that Beard had told her to give Jane a bath because she had defecated on herself. As Botello bathed Jane, she said that she had attempted to wash Jane's mouth where Beard had caused her to bleed and that this angered Beard, so he had picked up Jane, thrown her under the couch, and left her there for a few minutes. Beard then began to scream at Jane, telling her to get up and go to her room. Botello said that Jane had tried to get up but that she had just "flop[ped]" and had fallen down. Beard then grabbed Jane, took her into her room, and started choking her. Botello said that she had again tried to stop Beard and that Beard had punched her in the gut and ribs. By Botello's account, Beard then had Jane in the hallway, and he was continuously "stomping" on her.

Botello claimed that she had tried to get him to stop by yelling and pleading with him. Botello stated that he had then thrown Jane back on her bed, and Botello

14

said that she had run to find something with which to hit Beard. Beard allegedly followed Botello and began to choke her to the point that she could barely tell what was going on, but she remembered his running back into Jane's room and his yelling for Botello to come quickly. According to Botello, she ran into the room and saw Jane throwing up "green stuff." Beard started yelling, "I'm so sorry, I'm so sorry," because Jane was not breathing. Botello said that they both had tried CPR on Jane but to no avail. Botello stated that she knew that Jane "was gone." Botello claimed that Beard had then started punching her again because she "wouldn't focus." Botello said that she had started yelling at Beard that they needed to call somebody and that he had killed her baby. Botello said that Beard had then begun to cry.

Botello stated that Beard had begun to express regret and to apologize for all the times he had said that he wanted Jane dead. Beard then put Jane on her bed and initially covered her with a baby blanket. By Botello's account, Beard then left for a few minutes to sell some marijuana. After Jane died, Botello refused to talk to Beard even though she was constantly in his presence.

According to Botello, about an hour after Jane's death, Beard, crying and incredibly emotional, went to his mother's workplace, and his mother told him he could not be there. Botello said that she had gone with Beard because he had not wanted her to be by herself because she had told him that she wanted to kill herself. They left his mother's work, but his mother immediately called and asked what was wrong. Botello said that they had then met Beard's mother at a park twenty minutes

15

later where Beard and his mother had gotten into an argument, so the couple left. During the argument, Beard allegedly told his mother that Jane was staying at Botello's mother's house. Shortly after that, Beard's mother showed up at Beard's house, banged on the door, and demanded to know what was going on. Apparently, his mother then called the police about Beard's selling drugs. Botello said that the police had come and asked Beard questions, but then they had left.

Botello stated that about four hours after Jane's death, Beard had wrapped her body in a blue moving blanket, said that they needed to do something with the body, and put Jane's body in the trunk of Botello's car. Botello said that Beard had begged her not to tell anyone what had happened. She promised him that she would not. She alleged that the "story" that Beard had come up with was to simply tell everyone that they did not know what had happened to Jane and to stick with that story. He also began to suggest that the two of them "just leave," change their names, and stay off social media.

Botello said that they had then driven to Weatherford. When they arrived in Weatherford, they went to Cherry Park, placed their cell phones in a bag, and then hid the bag. From there, Botello said that they had driven to a Walmart where they had bought shovels and gloves. Botello told Lopez that the shovels were located near where they had buried Jane's body and that the gloves were located in the trunk of her car.

16

The couple then allegedly drove out to "Springtown," which police later determined was Poolville. As Beard looked for a place to bury Jane's body, Botello said that she had pleaded with Beard that Jane deserved a proper burial.

According to Botello, once they arrived at the burial site, Beard told her, "You d[o]n't have to do this, you know? You didn't have to come." She further stated that "he didn't threaten me to stay or anything, he didn't threaten me to help [bury Jane's body], [and] he didn't threaten me not to call anyone." While burying the body, Botello said that Beard had done most of the digging, that they had both covered the body with dirt, and that he had then placed some rocks and logs on top of the site. Botello described the grave as shallow.

Botello said that after Beard had killed Jane, "He [had] never got[ten] mad at [her] again." She said that he had never said hurtful things or hit her anymore. And Botello claimed, "He was so nice." She also said that Beard had prayed a lot in the car and asked her for forgiveness. Botello admitted that when Beard was arrested on July 5, 2014, he left her with both their phones.

Lopez asked Botello about how and when Beard had started abusing Jane. According to Botello, in the beginning, Beard had only spanked Jane's bottom, but he had spanked her so hard she could not walk. Beard then started biting Jane's hands as punishment and moved on to biting or stomping on her feet. Beard allegedly also choked Jane and picked her up by her larynx or took her by her arm or foot and swung her. According to Botello, Beard's abuse progressed to the point that he was

17

persistently punching Jane in the ribs. Botello said that a few days before Jane died, Beard hit Jane so hard that he broke her ribs. Botello asked him for permission to take Jane to the doctor, but he would not allow it. Botello said that she had known that Jane's ribs were broken because Jane could not lift her arm and had trouble breathing.

Botello stated that Beard had told her that anytime Jane acted up, Botello should slap Jane's face, hit her, or throw her across the room. Botello said that she had slapped Jane in the face once but could not do it anymore, so she had refused to hit Jane even when Beard had told her to do so. Botello said that during the slapping incident she had begun to cry and to tell Jane that she was sorry for hitting her and that Beard had reacted by hitting Botello and calling her derogatory names.

By Botello's account, Jane barely ate, and Botello had to hide feeding her from Beard. Botello said that when Beard went to the gym, she fed Jane, but when he came home, she had to hide the food. Botello said that Beard did not even want her giving Jane water. According to Botello, at first, Beard had allowed her to feed Jane, but if Jane "made a face" or acted up, Beard halted the feeding. Botello said that Beard had also secluded her from her family. And she claimed that she had told Beard not to hit Jane because he was not her father. That angered Beard and was when the abuse toward Botello began.

## I.     Botello's Second Interview with Police

Lopez said that he had interviewed Botello again on July 8, 2014, but this time Botello was under arrest. During the second interview, which was recorded and played for the jury, Botello explained again how she and Beard had left their cell phones in a park for the purposes of subverting any investigation and making it look as though they were at the park during the timeframe when they buried Jane's body. Botello claimed that she had not known how the mattress got placed up against the wall. She also claimed that the house was broken into during the time that she and Beard had initially gone to the motel and that they had learned this when they had returned to gather some more of their personal items—that is also when Beard was arrested on July 5. When officers asked her why she had not reported what had happened to Jane even after Botello was arrested, she said that she had feared him and his friends because they could cause her harm.

Botello again explained that Beard had begun abusing Jane in the early part of June and that a week later he had begun abusing Botello as well. She said that she had challenged Beard about the abuse, that they had argued about his treatment of Jane, and that he had stopped being abusive for a time but had gone "off" when Jane had done something "small."

Botello said that Beard was jealous that Jane was not his child, that he had continually brought up that Jane was another man's child, and that he was jealous of how much Jane and Botello loved each other. According to Botello, Beard said,

19

"How can you love something like that?" She also said that Beard had not allowed her to take Jane to her scheduled doctor's visits. By Botello's account, once Beard had started abusing both of them, Beard had rarely let Botello out of his sight. She said that the abuse toward Jane had occurred almost daily and that after it had started, she and Beard had often left Jane at home alone for hours at a time.

Regarding Beard's abuse of Jane, much like in Botello's first interview, she said that Beard had initially begun by spanking Jane's bottom but that the abuse had evolved into his striking her feet and eventually his punching her. Specifically, Botello said that Beard had lifted Jane's arm into the air and had "punch[ed]" her ribs. He had also grabbed her by her larynx. According to Botello, Beard had often claimed that Jane had started the incidents by making a face at him or by asking to be held by Botello instead of him. Botello claimed that she had known that Beard had broken Jane's ribs a week before he had killed her because Jane had constantly complained of pain, had gasped for air, and had held her arm away from her body due to the tenderness in the ribcage. Botello also said that Beard had bitten Jane on her feet and hands and that he had constantly left bruises and bite marks, specifically on Jane's pinkies. By Botello's account, Jane "still" had bite marks on her from previous abuse the day she died. Botello admitted that she had known that Beard's abuse could kill Jane but said that she had never lost control or abused Jane herself.

Botello also said that Beard had been very controlling of her, kept track of whom she had called or had messaged on the phone, and stopped allowing her to talk

to friends and family. She claimed that once she had tried to leave with Jane but that Beard had caught them and threatened to kill Botello and her family if she ever left him.

In addition to recalling many of the details about Jane's death from her first interview, Botello said that on the night that Jane had died, and as Beard was abusing Jane, she (Botello) had attempted to go into their bedroom and find a "baton" with which to strike Beard but that Beard had followed her, struck her, and begun choking her. She claimed that she had blacked out for a spell but had then awakened to Beard's yelling at her to come into Jane's room. When Botello arrived in the room, Beard was attempting CPR on Jane.

When officers asked why she had not attempted to defend Jane by using the rifle that was in the house, Botello said that Beard had threatened her that if she ever attempted to use the gun on him, he would kill her with it instead. When asked why she had assisted in burying Jane, Botello said that she had told Beard that he needed to turn himself in and that Jane needed a proper burial, but he had told her that she was never going to leave his side and that if she told someone about Jane, he would have to hurt her and whomever she told. She further said that she had helped bury Jane because she was scared that if she did not, he would hurt her like he had hurt Jane and because he had previously hurt her (Botello) so much that she could not move.

Botello also claimed that while she and Beard were in Walmart purchasing shovels and gloves, Beard had held her by the wrist the entire time, and she was never separated from him. When confronted with the fact that the Walmart surveillance video showed them separate at times and Beard's not holding her wrist, she said that she was scared, that he would have known what she was doing if she had tried to flee, and that he was not dumb. Botello said that she had thought about telling the cashier or giving the cashier a scared look but that she never did because she was frightened and in shock.

Botello also stated that Beard had devised the plan that the two would leave their cell phones in a park across town, go to Walmart and buy shovels and gloves, bury Jane's body, and then return for the phones. According to Botello, Beard had insisted on hiding the phones so that the couple could not be traced to the area where they had buried Jane's body. Botello said that about an hour after they had buried Jane's body, they had returned to the park to retrieve their phones.

## J.    Lopez's Continued Testimony

After Botello's interviews were published to the jury, Lopez went on to describe the place where Jane's body was exhumed. According to Lopez, the area was isolated, and Jane's body was buried underneath a small bridge that goes over a very small creek. The State introduced and published aerial photographs showing the location of the burial site, the Walmart, the discarded shovels, and the park where Beard and Botello had left their phones before they buried the body.

As can be heard in the second interview, Lopez testified that he had taken issue with Botello's statement that Beard had constantly had his hand on her wrist when the couple went to Walmart. The State introduced and published for the jury a still photograph from the Walmart surveillance video demonstrating that at one point while the couple was in Walmart, Beard and Botello were standing apart while he held one shovel with gloves and she held another shovel with gloves.

On cross-examination, Lopez averred that several things that Botello had told him were true, including the locations of cell phones, Jane's baby blanket, and the shovels and gloves that she and Beard had hidden away after burying Jane's body. Lopez further testified that Botello had been truthful about where Jane's body was located and that she had assisted the investigators in finding the body's exact location. Lopez also said that some of the bruises on Botello's hands and thighs that were present during her first interview corroborated some of her statements about Beard's having struck her. Lopez averred that Botello had always treated him and fellow officers with respect. He agreed that based on the fact that he had also investigated and had twice interviewed Beard, that Beard was a very controlling person.

## K.    Newquist Documents the Investigation

Arlington Police Department Crime Scene Investigator Nichole Newquist testified that she had assisted Lopez in coordinating the exhumation of Jane's body. According to Newquist, the location of Jane's body was difficult to get to because it required walking down a very steep embankment, through very high weeds, and

23

across a wet and sandy creek bed. She also said that she had collected the two shovels that Beard and Botello had hidden roughly 200 yards from the burial site. And she obtained a DNA sample from Botello.

Newquist said that she had photographed the scene as the medical examiner exhumed Jane's body. She also took photographs of shoeprints left at the scene and later took photos of the bottom of one of Botello's shoes; Newquist said that the pattern of the bottom of Botello's shoes was consistent with the shoe prints. While Newquist was on the stand, the State admitted and published for the jury the photographs that Newquist had taken. As the photographs were published, Newquist testified to what the jury was seeing, including pointing out where Jane's body had been found and where the shovels had been secreted away. Much like Newquist's testimony indicated, the photographs revealed that the area where Beard and Botello had buried Jane was a rural area that had required traversing a steep embankment, tall weeds, and a creek bed. The photographs also demonstrated the painstaking process of exhuming Jane's body; the process requires the use of dustpans and paint brushes.

Newquist averred that she also had photographed officers searching Botello's car the day after the exhumation. Much like Newquist had done with the photographs of the burial site, Newquist testified to the contents of the photographs as the State published them for the jury. One of the things that investigators found when searching the vehicle was a brown purse that contained receipts, $416 in cash, and marijuana. One of the receipts showed that the motel room had been prepaid in

24

cash for the period of July 5, 2014, through July 12, 2014. Investigators also found toys, children's shoes, and a child's nightgown with the size "infant 18 months." In the trunk, investigators found a Walmart sack containing two pairs of work gloves, as well as the Walmart receipt. Newquist averred that she had not taken DNA samples from the car because it was known that Jane, Beard, and Botello had all been in the car multiple times and that they could have left DNA on any number of occasions.

## L. The Contents of Botello's and Beard's Phones

Arlington Police Department's Detective Vy Phan testified at trial. Phan said that he had extracted data from both of the cell phones found in Botello's car. One of the texts that he recovered was a July 1, 2014 message from Botello to Beard in which Botello apologized to Beard for their recent troubles, declared her love for him, and asked that the two put their differences behind them. The message also told Beard to have fun working out. Phan further discovered that an internet search for a pawnshop had been performed on one of the phones on July 5, 2014. The extracted data further showed that someone had searched for motels in Arlington on the same day. Other data from Botello's phone revealed text messages discussing how to post bond for Beard and searches for "bail bond places near me."

## M. The Condition of Jane's Ribs

Forensic Anthropologist Dr. Dana Austin of the Tarrant County Medical Examiner's office testified that she had exhumed Jane's body and participated in conducting the autopsy. After explaining the painstaking process of exhuming Jane's

25

body, Austin described how she had dissected Jane's ribcages during the autopsy. According to Austin, she found one acute rib fracture that had occurred around the time of Jane's death. She found twenty-one fractures that were healing[3] on the left and right ribcages and seven ribs that showed signs of healing from something other than a fracture, e.g., a bone bruise.

According to Austin, the healing fractures and bruises indicated that the injuries had occurred prior to the day that Beard had killed Jane. But that was not the extent of the damage to Jane's ribs. Specifically regarding the left ribcage, Austin averred that in total there were twenty-two fractures and that some of the individual ribs had up to three fractures each. Regarding the right ribcage, Austin said that she had identified the one acute fracture and several other fractures. She also explained how she had determined that a number of the fractures had occurred between four and ten days prior to Jane's death. As she described these fractures, the State admitted and published for the jury pictures of Jane's ribs that were taken during the autopsy. Austin said that given the nature of the fractures, they were the result of "a very forceful blow . . . consistent with stomping or . . . hitting with a lot of force with some type of an object."

---

[3]Austin explained to the jury how she could identify when a bone fracture was healing and how a "healing" fracture was distinguishable from an "acute" fracture. Austin did not explain other types of fractures, but the record indicates that even though Austin identified twenty-one "healing" fractures and one "acute" fracture, she had identified other types of fractures as well.

26

## N.     The Remainder of the Autopsy

Forensic Pathologist Dr. Susan Roe of the Tarrant County Medical Examiner's Office also testified at trial. Roe said that she had performed the majority of the autopsy on Jane's body. Much like when Austin testified, the State admitted and published for the jury pictures taken during the autopsy as Roe described what the photographs displayed. According to Roe, she had identified nearly thirty external injuries to Jane's body, and she had discovered numerous internal injuries. The external injuries included bruises and abrasions to most parts of Jane's body, including her forehead and face. Roe also identified lacerations, bruises, and abrasions around Jane's lips and jawline. Roe said that although the external injuries would not have been fatal, some of the external injuries represented trauma to areas of Jane's body where the underlying injuries were fatal. Roe averred that the reason Austin had performed the portion of the autopsy on Jane's ribs was because the injuries were extensive.

Regarding internal injuries, Roe identified injuries to Jane's abdominal and pelvic area, rib fractures, a partial collapse of the left ribcage, and free-floating tissue and fluid in the left plural cavity. Roe said that the partially collapsed ribcage would have caused Jane to struggle to breathe and would have been extremely painful. She also said that the tissue found in the plural cavity contained both muscle and bone; this finding indicated an injury that was healing and thus would have happened prior to July 4, 2014. Roe further revealed that Jane had injuries to her bladder, bowel,

27

liver, kidneys, adrenal glands, lungs, and spleen. Roe said that Jane's liver displayed multiple lacerations that were caused by blunt trauma. Her spleen was also lacerated; Roe indicated that she had previously seen a lacerated spleen only in motorcycle or automobile accidents. Further, Jane's small bowel "had a large tear or laceration in it," her pelvic area revealed both acute and older injuries, her left lung was collapsed, and her right adrenal gland was completely shattered. Roe averred that "there [had] to [have been] a bit of force to get to [the area of the adrenal glands] to [have done] that kind of damage." Roe said that even though she had performed over 7,000 autopsies, she had previously never seen a shattered adrenal gland that was not the result of a car accident.

According to Roe, many of these injuries alone could have caused Jane's death, and Roe eventually attributed Jane's death to "b[l]unt force traumatic injuries." Roe agreed that the fatal injuries that Jane had sustained could have been caused by being stomped to death. And Roe determined that the manner of Jane's death was "homicide[] or death at the hands of another."

## O. Botello's Mother Testifies

Angela Sanchez, Botello's mother, testified for the defense. According to Sanchez, Botello met Beard through Facebook. Sanchez said that when Botello had begun dating Beard, Jane had stayed with her when Botello had stayed overnight at Beard's house. Eventually, and despite Sanchez's pleas that Jane remain with Sanchez, Botello and Jane moved in with Beard in May 2014; Sanchez said that she

had not approved of Botello's move because she felt Beard was mentally abusive to Botello. According to Sanchez, once Botello and Jane moved to Beard's, Sanchez never saw Jane again, and up until July 4, 2014, Sanchez had seen Botello only twice. Sanchez attributed her lack of communication with Botello and Jane to Beard's controlling and manipulative personality. Specifically, Sanchez said that Beard had not let Botello talk to or see Sanchez. Sanchez averred that she had spoken with Beard a couple of times and had requested to speak with Botello, but he told her in vulgar terms to stay out of their lives.

On cross-examination, Sanchez admitted that there were a number of family members, including herself, that would have let Jane stay with them when Botello moved in with Beard. Sanchez stated that even though Jane had insurance through her biological father, once Botello had moved in with Beard, Jane no longer made her regular doctor visits. Sanchez said that Botello had not attended her own graduation despite having family in town to see her graduate. Sanchez also said that on one of the two occasions when she saw Botello, she had come to Sanchez's house late at night to pick up her diploma, but Jane was not with her. And Sanchez averred that Botello had told Sanchez that Jane was with a friend.

By Sanchez's account, Botello never asked for help with Jane, nor did she ever ask for assistance in purchasing food or diapers for her. Sanchez said that she had offered to help after Botello had told her that there was no running water at Beard's

29

house. Sanchez also said that she was unaware of the physical abuse by Beard toward Jane and Botello.

Sanchez averred that on July 6, 2014, an unknown number persistently called her phone. Believing that it must be important, she answered, and the caller was an upset Botello. As they spoke, Sanchez asked about Jane's whereabouts, to which Botello said that Jane was with a friend. Sanchez stated that she had then asked for the address of the friend and that Botello had said that Jane was fine and instructed Sanchez to leave Jane where she was.

## P.    Botello Testifies

Botello testified in her own defense. Botello said that she had met Beard on Facebook after Jane's father had joined the Marines and that she and Beard had begun dating in January 2014. According to Botello, prior to moving in with Beard, she had seen Beard spank Jane only once, but she had confronted him about it and told him that it was not his place to discipline Jane. But eventually, Botello and Jane moved in with Beard in May 2014. From there, according to Botello, Beard became increasingly abusive toward her and Jane.

Botello recalled one of the first events when Beard struck her. By Botello's account, she told Beard that she had wanted to attend her high school graduation, but she and Beard got into an argument about her going to the graduation because Beard believed that she "didn't deserve to go." During the argument, Beard allegedly slapped Botello. Botello said that the argument escalated and that Beard grabbed her

30

face and dug his nails into her skin, leaving a wound. Beard allegedly then told her, "Well, you can't go now. Everybody is going to know what happened." Botello did not attend her graduation.

Botello said that Beard had become increasingly controlling to the point that she was not allowed to wear makeup or to contact her friends or family. She averred that Beard had controlled whatever she did, including when she was allowed to drive her own car, which Beard allowed her to drive only if he was with her.

Botello stated that Beard had "liked to choke [her] to the point to where [she would] pass[] out." She said that he had also liked to hit her in the head, in the ribs, and on the legs. He also allegedly had put her arms behind her back to the point that she thought her shoulders might dislocate. She said Beard had eventually physically and mentally controlled her and that she felt captured in his home. She also said that he had abused her when she had tried to clean the house. Botello testified that the reason she had never reported the abuse that Beard had inflicted on her or Jane was because he had that much control over her and because she had feared for her life.

By Botello's account, other than the one spanking of Jane that she had addressed with Beard, he had never struck Jane again until after the graduation incident. The first incident that Botello recalled in which Beard had been physically abusive toward Jane happened at the beginning of June 2014. Botello said that she had tried to intervene and that she had learned that if she would have sex with Beard, he would calm down and leave Jane alone. So Beard began to abuse Jane to compel

31

Botello to have sex when she did not want to do so. According to Botello, the sex was nonconsensual, but she had never reported having been sexually assaulted.

Botello believed that Beard had broken some of Jane's ribs in late June, but out of fear she had not called the police or anyone else. Botello said that she and Beard had discussed breaking up because of the violence and that he had promised to stop hitting her and Jane "until July 9th." Botello said, however, that in the early morning of July 4, 2014, she had awakened to the sound of Jane's crying. She went to Jane's room and could tell that Beard had struck her. She asked Beard what he was doing, and he had allegedly said, "All I wanted to do was smoke and hang out with her, and she just made that face at me." Botello said that to calm Beard down, she and Beard had gone to their bedroom and had sex. Botello averred that Beard's desire to have sex with her was the real reason that he had abused Jane that morning.

Botello said that she had awakened again to the sound of Jane's crying about 9:00 a.m. and that she had seen Beard shove Jane to the ground. Botello said that she had begun to yell at Beard and that he began to hit both her and Jane and had declared, "Don't tell me what to do with her." Beard's abuse escalated to where he was stomping on Jane. Botello averred that she had gone to the couple's bedroom to get something with which to strike Beard to make him stop but that Beard had followed her into the room and started choking her. After Beard stopped choking Botello, he returned to Jane's room to discover that she had stopped breathing.

32

According to Botello, the plan to purchase shovels and gloves at Walmart and to then bury Jane near Poolville was all Beard's idea. Botello also averred that the reason the Walmart video had shown the couple not immediately exiting the car upon parking was because he was telling her that if she tried to get away, he would harm her mother, grandmother, and grandfather. Botello said that after they had buried Jane's body, they recovered their phones and then went back to Beard's house to gather clothing and other items. Botello said that checking in to the motel had been Beard's idea and that he had paid for the room with cash that he had earned selling marijuana. The next day, according to Botello, the couple returned to Beard's house to retrieve more of their belongings. While there, Beard was arrested on past warrants and possession of marijuana.

Much like earlier testimony, Botello said that after Beard was arrested, she had returned to the motel. She was locked out of the room, and the manager let her in to stay for the night. Eventually, Botello ended up in her car. She said that she was crying and in disbelief at what had happened and that as she had sat there, Hoerig had approached her and asked about Jane. Botello said that she had voluntarily answered Hoerig's questions and voluntarily gone to the police station to be interviewed by Lopez and his partner. Botello averred that she had told the truth to the officers. She also testified that she had voluntarily assisted Lopez and other officers in finding Jane's body and that she had voluntarily showed them where the shovels were hidden.

33

Botello said that even after she was arrested, she had told the truth and cooperated with the police despite knowing she had the right to remain silent.

Botello explained that the reason she had sent the text to Beard on July 1, 2014, in which she had apologized and asked that they go forward as a couple, was because Beard had convinced her that everything was her fault. Botello testified that she did not want Beard released from jail after his arrest on July 5. By Botello's account, she did the searches on her phone for how to bail out Beard because he had told her to do so. And because he had also called his "drug dealers" to assist her, she feared them.

On cross-examination, Botello averred that she should have called someone about Beard's abusive behavior and that she should have called Jane's doctor. She also agreed that she could have left Jane with either her mother or grandmother because they had offered to care for her. And she agreed that she could have prevented Jane's death had she made appropriate efforts to protect Jane.

Botello said that prior to her moving in with Beard, he had spanked Jane only twice and that they had argued about it. She also said that she had known that Beard and Jane did not have a good relationship prior to moving in with him and that she and Beard had texted as early as January 2014 about his having a bad relationship with Jane.

She agreed that Beard was a controlling and manipulative person who was "an awful human being." According to Botello, once she and Jane had moved in, and

34

after the first time Beard was violent with Botello, she had wanted to send Jane to her mother's care, but Beard would not let her call her mother. The State introduced a photograph of Botello and Jane that was taken after Beard had allegedly made marks on her that she said had prevented her from going to graduation. However, she agreed that the photograph did not show any visible injuries to her face, and she said that she had no explanation for that.

Botello admitted that both she and Beard had cheated on each other during their relationship, that they had both tried to break off their relationship, but that either he had begged her to stay or she had begged him not to leave. Botello agreed that her decision to move in with Beard was selfish. She also said that the reason she had not removed Jane from the home after Beard became abusive was because he had said that he would kill her family and because she knew that he would kill her.

When confronted with evidence that her phone showed a search on July 1, 2014, for how to place a child in temporary custody if someone were in the armed services, Botello said that Beard had entered the search terms on her phone. She averred that he had asked her to have his child and that he had considered joining the armed services. She admitted that she was the one who had searched for bond places on July 5, 2014.

Botello agreed that Jane had a "wonderful" life when she and Jane had lived with her mom. She also agreed that Jane had a lot of people who loved her there. Botello said that she did not know how often she and Beard had left Jane unattended,

35

but she agreed that sometimes it had been for hours. She also agreed that her bathing Jane using only a small bucket of water every other day was not an appropriate way to take care of her. Botello averred that the reason the highchair was the only thing clean in the house was because she had cleaned it after every use.

Botello admitted that there were multiple times when Beard had actually left her and Jane at the house alone, that sometimes she had texted him to ask when he was coming home, and that sometimes they had multiple missed calls to each other. She also said that she and Jane's father had texted quite a bit, sometimes on Beard's phone, and that sometimes the texts had included nude pictures of each other and descriptions of the sexual acts they had wanted to perform on each other. Botello acknowledged that one of the sexual texts had been sent on June 29, 2014.

When asked on cross-examination when Jane's ribs had first been broken, Botello said on the day she died, July 4, 2014. When pressed, she agreed that Jane's ribs had been broken prior to July 4 and that she had never called 911 nor sought medical treatment. Botello initially averred that Beard was at home on the night of July 3 into July 4 and that she did not know that he had left. But when presented with a timeline of waking to Jane's crying at 3:00 or 4:00 a.m. on July 4 and yet having sent a text that same morning at 3:04 a.m. asking Beard when he was coming home, she had no explanation for the discrepancy. She also had no explanation for why she had tried to call his phone at 4:45 a.m. on July 4, 2014. She further said that she had no

36

explanation for why text messages on her phone indicated that she had sold marijuana to one of Beard's customers at 1:15 a.m. on July 4.

Botello admitted that her grandmother had threatened to go to the police with a picture showing that Jane had bruises after Beard had spanked her prior to Botello's moving in with Beard. When confronted with her inconsistent statements from her first interview in which she had said that Beard had not threatened her to go with him to bury Jane's body nor had he threatened her to not call anyone versus her trial testimony that Beard had threatened her, Botello explained that her comment—"he didn't threaten me"—was specifically in reference to the burial only and that otherwise Beard had threatened her. Botello admitted that on July 5, Beard had gone to multiple places without her and that she still had not informed anyone that Jane was dead. She also admitted that police had come to the house on July 4 after Jane was dead but that she had not said anything to the police about Jane. Botello averred that she had been afraid when the officers had come that time because Beard had stared at her while she had spoken with an officer. She also agreed that after Beard was arrested on July 5, she had spent most of the evening trying to bond him out of jail. She averred that even though she had made more than 100 communications (calls, texts, etc.) from her and Beard's phones on July 6, none of those calls were to the police.

Botello also acknowledged that when McKenzie had shown up at the motel on July 6, she did not initially tell McKenzie what had happened to Jane. She further

37

acknowledged that when her mom had been on the phone with her around the same time, she had not told her mom what had happened. When asked why she had helped Beard cover up the murder of Jane, Botello said because she had known that "he would kill [her] family." She also agreed that she had possessed the financial means to get away while Beard was in jail. Later on redirect, Botello said that she had not gone to help bury Jane's body of her own free will; rather, she was compelled to do so because of Beard's rage, anger, and threats of death to her and her family.

## Q. The Trial Court's Exclusion of Testimony

During the presentation of her defense, Botello sought to call two of Beard's former girlfriends to testify ostensibly about his abusive and controlling behavior toward them. The trial court ruled that Botello would not be allowed to call Beard's former girlfriends to testify. Outside the jury's presence, Botello made an offer of proof regarding their testimony.

## R. Outcome

A jury found Botello guilty of capital murder of a child, injury to a child by omission,[4] and tampering with evidence with intent to impair a human corpse. After

---

[4]Even though Botello does not make a double-jeopardy argument, we note that "[w]here a legislature specifically authorizes cumulative punishments under two statutes, regardless of whether those two statutes proscribe the 'same' conduct . . . the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." *Missouri v. Hunter*, 459 U.S. 359, 368–69, 103 S. Ct. 673, 679 (1983). Under the guidance of *Hunter*, multiple courts of appeals in Texas have held that it does not offend double-jeopardy principles to proceed to trial under separate charges of injury to a child and capital murder of a child. *See*

the punishment phase, the jury assessed punishment at life for the capital-murder charge, thirty-five years' incarceration for the injury-to-a-child charge, and ten years' incarceration for the tampering-with-evidence charge. The trial court rendered judgment accordingly and ordered the sentences to run concurrently. This appeal followed.

## III. DISCUSSION

Because Botello's first three points challenge the sufficiency of the evidence to support each of her convictions,[5] we will cite the standard of review for sufficiency of the evidence, and then we will address her points in turn. We will then separately address her fourth issue regarding the trial court's denial of her request to call the two witnesses.

---

*Desormeaux v. State*, 362 S.W.3d 233, 236 (Tex. App.—Beaumont 2012, no pet.) (holding that convictions for injury to a child and capital murder for the death of the child did not violate double jeopardy); *Williams v. State*, 294 S.W.3d 674, 680 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (same); *see also Jimenez v. State*, 240 S.W.3d 384, 417–18 (Tex. App.—Austin 2007, pet. ref'd) (holding that convictions for both felony murder and injury to a child in the same trial did not violate double jeopardy).

[5]To the extent that Botello's first three points urge this court to also conduct a review of the factual sufficiency of the evidence, we decline to do so. This court has not conducted a factual sufficiency review since the court of criminal appeals announced in *Brooks v. State* that the *Jackson* standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

## A.    Standard of Review regarding Sufficiency of the Evidence

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV.   In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622.  Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622.  Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the

40

cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

### 1. Sufficiency of the Evidence to Support Tampering

In part of her first point, Botello argues that the evidence is insufficient to prove that she tampered with evidence with intent to impair a human corpse. We disagree.

A person criminally tampers with evidence if, knowing that an investigation is pending or in progress, she alters, destroys, or conceals anything with the intent to impair its verity or availability as evidence in an investigation or official proceeding. Tex. Penal Code Ann. § 37.09(a)(1). This third-degree felony is elevated to a second-degree felony if the thing altered, destroyed, or concealed is a human corpse. *Id.* § 37.09(c). "Pending" in the tampering statute means "impending, or about to take place." *See Lumpkin v. State*, 129 S.W.3d 659, 663 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd).

Here, Botello does not dispute that she and Beard buried Jane's body for the purpose of concealing it from potential investigators. Indeed, Botello explained in both of her interviews with police and in her testimony at trial that she had ridden with Beard from Arlington to Weatherford for the purpose of burying Jane's body, which she knew was secreted away in the trunk of her car. She further admitted that she had accompanied Beard to Walmart to purchase shovels and gloves for the purpose of burying Jane's body in a place where it would not be found. The State introduced surveillance video of Beard and Botello's purchasing the shovels and gloves, and as Lopez pointed out in his testimony, the video clearly demonstrated that

42

both Beard and Botello had used either gloves or plastic bags to prevent incriminating material from being transferred to the shovels. Botello admitted multiple times that prior to the burial, she and Beard had hidden their cell phones in a park well away from where they had buried Jane's body for the purpose of making any potential investigators think they had been somewhere else at the time they had buried the body. And Botello led investigators to Jane's body two days after she had admittedly assisted in the digging of the grave and the covering up of Jane's body.

Botello argues that the evidence is insufficient to support her tampering conviction because Beard had threatened to kill her and her family if she did not assist with the burial. Setting aside for the moment that most of Botello's argument seems to be a challenge to the jury's having rejected her duress defense, Botello also said in her first interview that after Beard had killed Jane, he had been kind to her and that he had even told her prior to them burying Jane's body that she did not have to participate in the burial. The jury was free to reject Botello's testimony that she had assisted in burying Jane's body because she had been threatened and was free to believe her statements in the first interview in which Botello had admitted that Beard had not compelled her to assist him in the burial. *See Queeman*, 520 S.W.3d at 622. We conclude that when viewing the evidence in a light most favorable to the jury's verdict, a rational factfinder could have formed a firm belief or conviction that Botello, knowing that an investigation into Jane's death was impending, had concealed Jane's body with the intent to impair its availability as evidence in the coming

43

investigation. *See* Tex. Penal Code Ann. § 37.09(a)(1); *Queeman*, 520 S.W.3d at 622. We overrule this portion of Botello's first point.

### 2. Sufficiency of the Evidence to Support Capital Murder of a Child

In part of her second point, Botello argues that the evidence is insufficient to support her conviction for the capital murder of Jane. Much like in her first point, Botello argues that she is not guilty of capital murder of a child by omission because Beard had allegedly told her that he would kill her and her family if she told anyone. The State's indictment alleged that Botello had either (1) intentionally or knowingly caused Jane's death by striking her with or against a surface or by stomping her with her foot or (2) intentionally or knowingly failed to seek medical attention at a time that she owed a parental duty to Jane.

As the indictment conveys, to convict Botello of capital murder, the State bore the burden of proving that she had intentionally or knowingly caused Jane's death. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(8). Under the law of parties, which was an instruction given to the jury in this case, "[a] person is criminally responsible as a party to an offense if the offense is committed by [her] own conduct, by the conduct of another for which [she] is criminally responsible, or by both." *Id.* § 7.01(a). A person is "criminally responsible" for an offense committed by another if

> (2) acting with intent to promote or assist the commission of the offense, [s]he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense;
>
> or

44

(3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, [s]he fails to make a reasonable effort to prevent commission of the offense.

*Id.* § 7.02(a)(2)–(3).

Pursuant to Section 151.001 of the Texas Family Code, a mother has legal obligations, among others, to protect her children and to provide them with medical care. *See* Tex. Fam. Code Ann. § 151.001(a)(2)–(3). As such, a mother is criminally liable for harm that befalls her child as a party to the offense if she knew a domestic partner was physically abusing the child and she failed to make reasonable efforts at intervention. *Carson v. State*, 422 S.W.3d 733, 743 (Tex. App.—Texarkana 2013, pet. ref'd). Collectively, a defendant's acts, words, and conduct before, during, and after the commission of an offense are probative of wrongful conduct and can constitute sufficient evidence of an understanding or common design to commit the offense. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). When the charge authorizes the jury to convict the defendant on more than one theory, such as the case at hand, the guilty verdict will be upheld if the evidence is sufficient under any theory authorized by the jury charge. *Id.*; *see Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992). Here, when viewing the evidence in a light most favorable to the jury's verdict, we conclude that the evidence is sufficient under the "legal duty" theory; therefore, we address only that theory. Tex. Penal Code Ann. § 7.02(a)(3).

In this case, Botello does not dispute that she was the mother of Jane and that she had the legal duty to protect and provide medical care to Jane. Indeed, Botello testified at trial that she bore this duty, and she averred that had she attempted to, she could have prevented Jane's death. Botello also does not dispute that she was present when Beard killed Jane. And the evidence demonstrates that although multiple family members had offered to care for Jane, Botello still took Jane with her when she moved in with Beard. The evidence also demonstrates that prior to Botello's moving in, she was aware that Beard did not have a good relationship with Jane and that he had caused bruising to Jane while punishing her—an incident that caused Botello's grandmother to threaten to go to the police if Botello and Jane moved in with Beard.

The evidence also indicates that Botello had left Jane home alone and that she had lied to relatives and said that Jane was either with her mother or with a friend. And the record is rife with evidence that once Botello and Jane had moved in with Beard, he escalated his abuse of Jane. Botello admitted multiple times in interviews and at trial that she had known that Botello had broken Jane's ribs prior to July 4, 2014, but she had not sought medical care. Botello's testimony about Jane's ribs was confirmed through the autopsy. She also admitted that she had known that Beard's abuse could kill Jane. Thus, Botello was fully aware that Beard's abuse could be fatal to Jane, and yet she did nothing to prevent or stop the abuse.

Although Botello said that she had attempted to retrieve something with which to strike Beard, the jury was free to disbelieve her, especially given that she had

46

provided at least three differing accounts of what she had attempted to retrieve. Botello's changing stories demonstrated a consciousness of guilt. *See Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd) ("[H]is inconsistent statements and implausible explanations indicate guilt, and that additional evidence supports the jury's finding of guilt."). The jury was also free to believe that Botello should have used the gun in the house to prevent Beard from continuing to abuse Jane.

Botello said multiple times that after she had awakened at 4:00 a.m. on July 4 to Beard's beating Jane, she had convinced him to go to bed with her instead of seeking medical attention for Jane or contacting the police. The jury was free to believe that Botello had lacked the proper concern for Jane when the couple had gone back to bed without contacting emergency personnel at that time. The jury was also free to disbelieve Botello's explanations that she had not contacted anyone or sought help because she had been scared of Beard. In fact, the record demonstrates that Botello had numerous opportunities to leave with Jane when Beard was gone prior to Jane's death; that she had the same opportunities to call the police or relatives; and that even after Jane's death, she had numerous opportunities to contact the police or relatives, but she had chosen not to do so. And the State introduced evidence that at the time Botello had claimed that Beard was actively abusing Jane, Botello was searching for Beard's whereabouts.

47

The record also indicates that when Botello had awakened the second time, ostensibly around 9:00 a.m. on July 4, she had observed bruises, cuts, and bite wounds all over Jane's body. Again, she did not seek help. She also admittedly watched Jane attempt to walk to her room after much of the abuse had already occurred but noted that Jane had failed to do so because her injuries were so extensive she could not stand. Botello still did not seek help. Furthermore, when Beard again began to abuse Jane by throwing her around and then stomping on her, Botello again did not seek assistance from anyone. And once Jane was dead, Botello still did not attempt to contact police, medical personnel, or relatives despite the fact that at numerous points after Jane's death, Botello was admittedly alone—including when Beard was in jail. *See Lee v. State*, 866 S.W.2d 298, 302 (Tex. App.—Fort Worth 1993, pet. ref'd) ("Appellant chose not to call the police and report the shooting and have the body removed."). The jury was free to disbelieve that Botello had feared Beard or his friends and to conclude that Botello was more concerned with bailing Beard out of jail than she was in reporting Jane's death.

Botello's conduct after Jane's death also supports the jury's verdict. Indeed, Botello admittedly helped bury Jane's body in an effort to hide what had happened. *See Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) ("Applicant's attempts to conceal Jerry's body and his implausible explanations to police are strong evidence of applicant's consciousness of guilt."). It was the jury's province to believe that she had buried Jane's body without threats of violence by Beard given that in

Botello's first interview she had said that Beard had not threatened her and had told her that she did not have to participate in burying Jane's body.

Botello also did not disclose to Muslimovic that Jane was dead or missing on July 5, after Muslimovic had placed Beard under arrest and in a patrol vehicle and had then returned inside the home to specifically speak with Botello about concern for Jane. Moreover, rather than tell either McKenzie or Sanchez about what had happened to Jane, Botello had lied to them and told them that Jane was with a friend. And Botello's story about what had transpired on the night that Jane had died changed multiple times between her initial contact with Muslimovic, her first and second interviews with police, and her testimony at trial. Botello's inconsistent stories and implausible explanations are circumstances inferring her guilt as a party to Jane's murder. *See Guevara*, 152 S.W.3d at 50 ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."). Further, the jury had before it evidence that despite Botello's claims that Beard had choked her and hit her in the face, Mulsimovic, Lopez, and Kringen all said that they did not observe signs of abuse to Botello's neck and head after Jane's death.

We conclude that a rational factfinder could have found that Botello had a legal duty to prevent Beard from beating Jane to death and that acting with intent to promote or assist her murder, Botello had failed to make a reasonable effort to prevent Jane's death. *See* Tex. Penal Code Ann. § 7.02(a)(3). Thus, the evidence is

49

sufficient to support the jury's verdict that Botello is guilty of the capital murder of Jane. *See Carson*, 422 S.W.3d at 743. We overrule this portion of Botello's second point.

### 3. Sufficiency of the Evidence to Support Injury to a Child

In part of her third point, Botello argues that the evidence is insufficient to support her conviction for injury to a child by omission. Much like her other two sufficiency points, Botello argues that she was acting under the threat of her and her family's being harmed by Beard. We conclude that the evidence is sufficient to support the jury's verdict.

To convict Botello of injury to a child by omission, the State was required to prove that Botello "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, cause[d] to a child . . . serious bodily injury . . . if . . . the actor has a legal or statutory duty to act . . . ." *See* Tex. Penal Code Ann. § 22.04(a), (b). As mentioned above, a parent has legal obligations, among others, to protect her children and to provide them with medical care. *See* Tex. Fam. Code Ann. § 151.001(a)(2)–(3).

In this case, when viewing the evidence in a light most favorable to the jury's verdict, the evidence shows that Botello persistently exposed Jane to an environment of abuse without fulfilling her legal obligation to protect Jane or to provide her with medical care. *See id.* Jane should never have lived at Beard's house. Botello admitted that Beard and Jane had a bad relationship prior to their moving in with Beard, that

50

Beard was jealous that Jane was another man's child, and that he had already bruised Jane when he had spanked her prior to her moving in with him. The evidence also demonstrates that Botello's mother and grandmother had offered to care for Jane and that both of them were upset when Botello decided to move Jane to Beard's.

Further, Botello consistently admitted that she had not sought medical care for Jane even after she had wholly understood the type of physical abuse that Jane was enduring. The record is replete with evidence that Botello had known of Beard's abusive behavior toward Jane and how the abuse had continued to escalate the longer Botello and Jane had stayed with him. Botello admitted that she had known that Jane had needed to have her ribs examined because they were broken but that she had not taken Jane to the doctor because she had feared Beard. But the jury was free to disbelieve that was the reason she did not seek medical care. More than that, Botello's knowledge of Jane's broken ribs a week before her death made certain that Botello had known about the damage that Beard could cause to Jane's ribs on the day she died. Botello explained to investigators the distressing sounds that Jane had made and the actions that Jane had taken. The sounds and actions made it obvious that Jane was in pain and in dire need of medical attention. And even throughout the drawn-out abuse that had occurred on the day Jane died, Botello had numerous opportunities to see Jane's distress and pain, and yet she still did not contact police or medical personnel; she did not take action to protect Jane even though she admitted at trial that there were actions that she could have taken.

51

Just as condemning is Botello's lack of actions after Jane's death. As detailed above under the analysis of Botello's second point, Botello had a number of chances to contact relatives or police without Beard's interference after Jane's death because he was either gone or in jail, but Botello did not seek assistance. *See Guevara*, 152 S.W.3d at 49 (reasoning that a defendant's acts, words, and conduct before, during, and after the commission of an offense are probative of wrongful conduct and can constitute sufficient evidence of guilt). The jury even had before it evidence that between the time that Botello had placed Jane in bed after the initial 4:00 a.m. abuse and when she had awakened again to Jane's cries at 9:00 a.m., Beard was at a former girlfriend's house, and Botello was actively seeking his whereabouts by calling his phone. Just like the evidence that supports her conviction for capital murder, there is a great deal of evidence in this record that Botello failed to fulfill her duty to protect and seek medical care for Jane by recklessly omitting actions to either stop Beard from killing Jane or to seek medical care when it became obvious that Jane needed it. And Botello's actions—of participating in burying Jane's body and hiding the shovels and phones so that Jane's body would not be discovered or that her burial would not be linked to her and Beard—show that she consciously felt guilt for what she had not done for Jane. *See Ex parte Weinstein*, 421 S.W.3d at 668.

We conclude that a rational factfinder could have formed a firm belief or conviction that Botello, recklessly by omission, had caused serious bodily injury to Jane while Botello had a legal or statutory duty to act. *See Williams v. State*, 294 S.W.3d

674, 684–85 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (holding that sufficient evidence existed to support conviction for injury to a child by omission, because deceased child had suffered injuries requiring medical treatment, but mother had not sought treatment). We overrule this portion of Botello's third point.

### 4. Botello's Duress Defense

In the remainder of her first, second, and third points, it appears that Botello is arguing that the evidence demonstrates that the jury erred by rejecting her duress defense. Even though Botello does not delineate this as a separate point, in each of her first three points she sets forth evidence that she was allegedly under duress when she had failed to protect Jane or when she had helped bury her body. The State identified this theme as well and briefed the issue of duress, so we will address it.

To establish the affirmative defense of duress, a defendant must prove by a preponderance of the evidence that she committed the offense because she was compelled to do so by threat of imminent death or serious bodily injury to herself or another. Tex. Penal Code Ann. § 8.05(a). Compulsion "exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure." *Id.* § 8.05(c); *see also Edwards v. State*, 106 S.W.3d 833, 843 (Tex. App.—Dallas 2003, pet. ref'd). "'Imminent' means something that is immediate, something that is going to happen now." *Murkledove v. State*, 437 S.W.3d 17, 25 (Tex. App.—Fort Worth 2014, pet. dism'd, untimely filed) (citing *Dewalt v. State*, 307 S.W.3d 437, 454 (Tex. App.—Austin 2010, pet. ref'd)). Imminent harm must be shown by affirmative

53

evidence. *Darty v. State*, 994 S.W.2d 215, 218–19 (Tex. App.—San Antonio 1999, pet. ref'd). A threat of harm at some indefinite time in the future is insufficient to satisfy the requirement of imminence. *Ramirez v. State*, 336 S.W.3d 846, 851–52 (Tex. App.—Amarillo 2011, pet. ref'd). But the affirmative defense of duress is not available "if the actor intentionally, knowingly, or recklessly placed [her]self in a situation in which it was probable that [s]he would be subjected to compulsion." Tex. Penal Code Ann. § 8.05(d). And simply because the defendant presents a different version of the facts does not render the State's evidence of the lack of duress insufficient. *Anderson v. State*, 701 S.W.2d 868, 872 (Tex. Crim. App. 1985).

Here, the evidence is sufficient to show that Botello had knowingly placed herself in a situation that had compelled her to allow for Beard to abuse Jane, ultimately causing her death, and that had compelled her to cooperate with Beard in disposing of Jane's body. *See* Tex. Penal Code Ann. § 8.05(d). Indeed, the jury had before it evidence that Botello should have never taken Jane to Beard's house given his dislike for her and Botello's family's concerns over his conduct toward Jane. And Botello was fully aware of the consequences of her and Jane's remaining with Beard. Botello knew that Beard had broken Jane's ribs a week prior to her death. Botello also knew that Beard had a propensity to treat Jane badly by not letting her eat, bathe, or attend her doctor's visits. Botello was further aware that Beard had referred to Jane as a "demon," and Botello knew that Beard had often snapped at perceived slights from Jane, an eighteen-month-old child. Beard's reaction to these perceived

54

slights often served as his impetus to physically abuse Jane. Most of all, Botello had witnessed the month-long abuse that had continued to escalate resulting in Jane's death. And at trial and in her interviews with police, Botello admitted that she had known that Beard's behavior could result in Jane's death. *See Maestas v. State*, 963 S.W.2d 151, 156–57 (Tex. App.—Corpus Christi 1998), *aff'd*, 987 S.W.2d 59 (Tex. Crim. App. 1999) (concluding that the jury's rejection of duress was sufficiently supported by evidence because no overwhelming evidence in the record existed that boyfriend had forced defendant to cooperate and obtain murder weapon).

The evidence also sufficiently supports that Botello had knowingly placed herself in a situation that had compelled her to assist Beard in tampering with Jane's corpse. The jury had before it copious amounts of evidence that Botello had done whatever Beard said, including ceasing communication with her family, not wearing makeup, not driving by herself, not regularly feeding or bathing Jane, not cleaning the house, not keeping Jane out of abject filth, and not taking Jane to the doctor. The jury also had before it evidence that Botello was willing to stay with Beard despite his abusive and controlling behavior as evidenced by her July 1 text to Beard apologizing for their relationship struggles, expressing her love for him, and asking that they continue to maintain a relationship. *See Tejeda v. State*, No. 05-99-00632-CR, 2000 WL 1529042, at *1–2 (Tex. App.—Dallas Oct. 17, 2000, no pet.) (mem. op., not designated for publication) (reasoning that the jury was free to reject defendant's claim

55

that he had only helped brother bury his stepson's body because he was scared brother would hurt his other son if he did not help him).

To the extent that Botello is arguing in her first three points that the evidence does not support the jury's rejection of her duress defense, we overrule the remainder of these three points.

## B. The Trial Court's Not Allowing Botello to Call Beard's Former Girlfriends to Testify

In her fourth point, Botello argues that the trial court erred by not allowing her to call two of Beard's former girlfriends to testify in order to show that they too had suffered under Beard's controlling and abusive behavior when they were in relationships with him. Specifically, Botello argues that under Rule 406 of the Texas Rules of Evidence, she should have been allowed to call these witnesses to show that Beard had acted in accordance with his habit or routine when he had allegedly abused and controlled Botello. *See* Tex. R. Evid. 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."). The State argues that Botello has failed to preserve this issue for our review. We agree with the State.

As a general rule, to preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the

56

request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Layton v. State*, 280 S.W.3d 235, 238–39 (Tex. Crim. App. 2009). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009); *Reyes v. State*, 361 S.W.3d 222, 228–29 (Tex. App.—Fort Worth 2012, pet. ref'd).

At trial, Botello cited both Rules 405(b) and 406 when arguing that she should have been allowed to call Beard's former girlfriends to testify. Tex. R. Evid. 405(b), 406. Although Botello received an explicit ruling regarding her Rule 405(b) objection, she did not receive a ruling on her Rule 406 objection. In oral arguments before this court, Botello candidly admitted twice that she had not received a ruling on her Rule 406 objection.[6] Thus, Botello has failed to preserve this complaint for our review. *See Reyes*, 361 S.W.3d at 229 (holding that appellant failed to preserve complaint for

---

[6]Because she admitted, through counsel, that she had not obtained a ruling on her Rule 406 objection, Botello implied that her objection was one of due process and was "substantive" in nature. But even due process claims must be preserved in order to be reviewed. *See Clark v. State*, 365 S.W.3d 333, 339–40 (Tex. Crim. App. 2012) (concluding that due process complaint must be raised in trial court to be preserved for appellate review). Thus, to the extent that Botello attempted to make a due process complaint on appeal, she has also failed to preserve that objection for our review.

review because appellant did not obtain a ruling in trial court). We overrule Botello's fourth point.

## IV. CONCLUSION

Having overruled all four of Botello's points, we affirm the trial court's judgments.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 31, 2019